The STATE of Texas et al., Petitioners,

v.

CONNECTICUT GENERAL LIFE IN-
SURANCE COMPANY, Respondent.

No. A-9917.

Supreme Court of Texas.

July 15, 1964.

Rehearing Denied Oct. 28, 1964.

Waggoner Carr, Atty. Gen., Austin, H. Grady Chandler and W. E. Allen, Asst. Attys. Gen., for petitioners.

Clark, Thomas, Harris, Denius & Winters, Conrad Werkenthin and Mary Joe Carroll, Austin, for respondent.

STEAKLEY, Justice.

With legislative permission, Connecticut General Life Insurance Company, Respondent, instituted this suit to recover overpayments to the State of occupation taxes totaling $408,661.26 for the years 1952 through 1957, and for the year 1959. The judgment of the trial court for Respondent was affirmed by the Court of Civil Appeals. State v. Connecticut General Life Insurance Co., 372 S.W.2d 352. Petitioners are the Attorney General, the State Treasurer, the Commissioner of Insurance, and the members of the State Board of Insurance.

Article 4769, Vernon's Annotated Texas Statutes [1], requires insurance organizations to file an annual statement of its gross premiums during the preceding calendar year from persons residing or domiciled in Texas. It imposes thereon a maximum tax of 3.3 per cent which is reduced on a sliding scale to a minimum of 1.925 per cent, depending on the ratio of investments of the company in Texas securities to investments in similar securities in the state in

1. Article 4769 remained so designated notwithstanding the enactment of the Insurance Code of 1951 and of Title 122A, Taxation, in 1959. It is carried under Title 78, Insurance, at page 484 of volume 14A, Vernon's Annotated Texas Statutes.

which the company has invested the highest percentage of its admitted assets. The report is required to be filed on or before the first day of March of each year. The Board of Insurance Commissioners[2] is required to certify to the State Treasurer "the amount of taxes due * * * which shall be paid * * * on or before the fifteenth day of March, following."

Respondent timely filed the annual reports and sworn statements required by Article 4769 for the years in question, 1952 through 1957, and 1959. In each instance the Board of Insurance Commissioners certified to the State Treasurer that Respondent owed for each year the amount in taxes shown on the annual reports. The remittances of Respondent in such amounts for each year were also delivered by the Board to the State Treasurer. These remittances by Respondent of the amounts certified by the Board were prerequisite to the right of Respondent to the issuance of a permit to continue its business in Texas. Article 4.05 of the Insurance Code, Vol. 14, V.A.T.S., provides, in part:

"Upon the receipt of sworn statements showing the gross receipts of any insurance organization, the Board of Insurance Commissioners shall certify to the State Treasurer the amount of taxes due by such insurance organization for the preceding year, which taxes shall be paid to the State Treasurer for the use of the State, by such company. Upon his receipt of such certificate and the payment of such tax, the Treasurer shall execute a receipt therefor, which receipt shall be evidence of the payment of such

taxes. *No such life insurance company shall receive a certificate of authority to do business in this State until such taxes are paid."* (Italics added.)

In its reports for the years in question, Respondent did not list its Texas securities and its similar securities in the state of its highest investment of assets, but merely stated the ratio to be less than 75% for the years 1952–57; the rate of tax according to the face of these reports was therefore 3.3 per cent for these years. A rate of 2.2 per cent was shown for the year 1959. The Court of Civil Appeals determined upon the basis of the stipulations of the parties quoted in its opinion that Respondent was entitled to a rate of 1.925 per cent for each year in question. This resulted from the affirmative findings of alternative stipulations 15 and 17 by the trial court; the finding as to stipulation 17 was not brought under attack in the appeal and the Court of Civil Appeals properly declared the law applicable to stipulation 15. The overpayments which follow from this determination constitute the amount of the judgment of the trial court which was affirmed by the Court of Civil Appeals, both of which judgments are, in turn, affirmed.

■ The problem of the recovery of taxes which a taxpayer has paid but which he does not owe has confronted the courts under many circumstances and with varied results. See the annotations in 64 A.L.R. 9, 84 A.L.R. 294, 94 A.L.R. 1223, 165 A.L.R. 879, 84 A.L.R.2d 1133; also 51 Am.Jur., Taxation, §§ 1183–1213, 84 C.J.S. Taxation §§ 634–637. This Court has consistently held that the voluntary payment of an illegal tax will not support a claim for repayment; but that a payment under duress,

---

2. The 1957 amendment to the Insurance Code of 1951 provides that "Except as otherwise provided herein, all remaining references in the Insurance Code and other statutes of this state to 'Board of Insurance Commissioners,' 'Board,' or individual Commissioners shall mean the 'State Board of Insurance' or the 'Commissioner of Insurance,' consistent with their respective duties and responsibilities under the terms and provisions of this amendatory Act." Art. 1.02(c); Acts 1957, 55th Leg., p. 1454, ch. 499, § 2.

which may be either express or implied, is not a voluntary payment and may be recovered. Austin National Bank v. Sheppard, 123 Tex. 272, 71 S.W.2d 242; National Biscuit Co. v. State, 134 Tex. 293, 135 S.W.2d 687; Union Central Life Insurance Co. v. Mann, 138 Tex. 242, 158 S.W.2d 477; Metropolitan Life Insurance Company of New York v. Mann, 140 Tex. 450, 168 S.W.2d 212; State v. Akin Products Co., 155 Tex. 348, 286 S.W.2d 110.

The crucial test is whether the taxpayer acted under duress and duress was found in each of the foregoing decisions by this Court. Duress was not found in Corsicana Cotton Mills v. Sheppard, 123 Tex. 352, 71 S.W.2d 247, which was decided contemporaneously with Austin National Bank v. Sheppard. The duress in Austin National Bank rested on the fact that the refusal of the corporation to pay the additional filing fee demanded by the Secretary of State would have subjected it to the risk of having its right to do business in this state called in question with a resulting injury to its business should such occur. The absence of duress in Corsicana Cotton Mills rested largely on the conclusions that " * * * we find nothing therein that can be construed as a contention that the taxes here involved were claimed or demanded by the state or any state authority"; and that the reports filed by the corporation gave the Secretary of State "no information by which he could have known that any overpayment of franchise taxes was being made."

In Metropolitan, as here, the insurance company overpaid the tax required of it under Article 4769. The report of the company reflected on its face a higher tax than was actually owed. The Commissioner of Insurance certified the incorrect amount shown on the report and forwarded to the State Treasurer the remittance of the company in payment of the certified amount. The only difference between the problem in Metropolitan, and here, is that the report form then prescribed for use in complying with Article 4769 subjected the company to a higher tax liability, if literally followed, than required by the statute. This was the basis for the statement in Metropolitan that "The form, in legal effect, demanded that such taxes be paid in conformity therewith. This is evident because the form, in effect, required relator to pay the very illegal taxes this appropriation was made to refund." But it is to be noted that the company in Metropolitan did not consider itself bound by the report form and, indeed, included information not called for which reduced its tax liability. Nevertheless, this Court held:

"The form contained at the very beginning a very pertinent admonition or reminder. Such admonition or reminder reads as follows: 'The officers of any company who knowingly submit under oath a tax return under which the amount paid is less than the amount actually due the State under its laws render themselves and the company subject to all the penalties provided by law for such action.' [The forms in the case at bar contained the same admonition]

"To our minds the part of the report form just above quoted, in legal effect, was and is a statement that a failure, on the part of the relator, to make its report in conformity therewith, and so pay its taxes, would result in its being subjected to the penalties prescribed by our laws. One of these penalties was that it would not receive a renewal of its certificate to do business in Texas. Article 4769, supra. The withholding of such certificate would have compelled relator to cease writing insurance in this state, and thus would have subjected it to a great inconvenience, and financial loss. No court action was, or is, required to enable the Commissioner to withhold a renewal certificate. Taxes paid un-

der the circumstances we have detailed are taxes paid under duress."

Implicit in Metropolitan is the holding that taxes are paid under duress when an act of the Commissioner of Insurance causes or results in an overpayment of taxes by an insurance organization, the payment of which in such amount is necessary to avoid the loss of the right of the insurance company to do business in this state. In Metropolitan this act was considered to be the furnishing of a report form which, if followed, would compel the payment of more taxes than owed. In the case at bar there is a comparable act which follows from the second major holding in Metropolitan. Article 4769 defines the duty of the Board of Insurance Commissioners with respect to the annual reports required by the statute, as follows:

"Upon receipt by it of the sworn statement above provided, the Board of Insurance Commissioners shall certify to the State Treasurer the amount of taxes due by such insurance organization which shall be paid to the State Treasurer on or before the fifteenth day of March, following, and the State Treasurer shall issue his receipt therefor as evidence of the payment of such tax."

In construing the foregoing, this Court said in Metropolitan:

"*The statute requires the Commissioner to certify to the State Treasurer the amount of taxes due. Certainly this does not confine the Commissioner's certificate to the amount shown by a report if such report is incorrect.* To so hold would be to add something to the statute not contained therein. The statute says that 'the Commissioner of Insurance shall certify to the State Treasurer the amount of taxes due by such company for the preceding year, * * *.' The construction contended for by the respond-

ents would call on us to add to the statute, the additional provision, *as shown by such report,* and would compel the Commissioner to issue a renewal certificate even though he knew the insurance company involved had not reported all taxes due." (First italics added.)

It is thus the statutory duty of the Commissioner of Insurance to certify the correct amount of taxes due and owing by a reporting insurance organization, whether more or less than the amount shown by the report. The discharge by the Board of this duty to certify the taxes actually due and owing will necessarily disclose if a company has reported taxes which it does not owe. One of the controlling facts upon the basis of which no duress was found in Corsicana Cotton Mills was the absence of any information to indicate that the taxpayer had overreported and overpaid. The corollary fact of controlling legal significance, which was also absent in Corsicana Cotton Mills, is that the certification, in legal effect, is a demand by the state that the tax in such amount be paid, otherwise the company will subject itself to the loss of its right to do business in Texas.

So it is that in the operation of the statute as it has been construed by this Court, the overpayment of taxes by Respondent for the years in question did not result from its failure to properly list its securities and to indicate the lower and proper rate in its reports. The overpayments resulted from the incorrect certifications, and under the rationale of Metropolitan, and other decisions by this Court, the payments by Respondent of the amounts certified by the Board of Insurance Commissioners were payments under duress of the certifications, and of the applicable statutory provisions. Respondent therefore has a valid claim for recovery of the overpayments of taxes which were included in the certifications of the Board of

Insurance Commissioners for the years in question.

We recognize that it may not have been feasible (although it was possible) for the Board of Insurance Commissioners to have determined before the certification deadlines the correct amount of taxes due and owing by Respondent for the years in question. But our conclusions are not gainsaid by this fact nor by practices of expediency which may have developed during the years, i. e., that the reporting companies send along their remittances in the amount of the taxes shown in their reports and that the Board routinely certifies the amounts shown in the reports and transmits to the State Treasurer the remittances of the companies which accompanied their reports.

The judgments of the trial court and of the Court of Civil Appeals are affirmed.

CALVERT, Chief Justice (dissenting).

I respectfully dissent.

The judgments of the trial court and the Court of Civil Appeals awarding Connecticut General a recovery are affirmed by this Court solely on the theory that its payment of more taxes than it owed was under duress. I suggest that on the record before us the Court has reached a legal conclu-sion for which there is neither substance nor shadow of support in the facts.

It is not held that overpayment was made under actual duress; rather, it is held that overpayment was made under "implied duress." "Implied duress" is a legal fiction, invented by the courts to give relief to those who in their own immediate self-interest yield to illegal or unwarranted demands rather than risk loss or harm by reason of failure to do so. So far as I can determine from the cases cited by the Court and from independent research, the legal concept of "implied duress" has never heretofore been used as a cloak for reliev-ing one of the consequences of his own mistakes of fact. Here, the Court uses it as a basis for relieving Connecticut Gen-eral not only of the consequences of its own mistakes of fact, but as well of the consequences of its own negligence.

The charge that Connecticut General's overpayment of taxes resulted from its own negligence should not be made without a statement of the evidence which supports it.

The relevant part of the printed form furnished by the Board of Insurance Com-missioners to insurance companies for mak-ing their annual reports, and the manner in which the form was completed by Con-necticut General for the years 1952–1957, is illustrated by the report for the year 1952, which is reproduced.

## PART I

### TEXAS SECURITIES

Item

1. The amount of said Company's entire reserve on its entire business in force in the State of Texas on De-cember 31, 1952, ................................ $22,890,583.00
   See Item 6, Part IV, hereof.

2. Total amount required to be invested in "Texas Se-curities" December 31, 1952, being equal to three-fourths of said amount ........................... $17,167,937.25

3. This Company had invested on December 31, 1952, in "Texas Securities" ............................. $46,780,822.10
   See Item 14, Part II hereof.

## COMPUTATION OF TAX

Item

4. On December 31, 19<u>52</u>, This Company had the highest percentage of its admitted assets invested in The State of ————————. On that date it owned in such state securities similar to "Texas Securities" amounting to ....................................  $_____

   See Item 14, Part II hereof. <u>Less than 75%</u>

5. Ratio to determine rate of tax (Item 3 divided by Item 4) .....................................

6. Rate of tax to be paid ...........................  <u>3.3%</u>

   If Item 5 is 75% or less, insert 3.3% as rate of tax.

   If Item 5 is more than 75% but not more than 80%, insert 3.025% as rate of tax.

   If Item 5 is more than 80% but not more than 85%, insert. 2.75% as rate of tax.

   If Item 5 is more than 85% but not more than 90%, insert 2.2% as rate of tax.

   If Item 5 is more than 90%, insert 1.925% as rate of tax.

   If the Company's gross premium receipts for the year, wherever and irrespective of from whom collected, are less than $450,000, insert 55/80 of 1% as rate of tax regardless of Item 5. (See Item 1, Part III.) (Article 4769 as amended by H.B. 285, 52nd Legislature.)

7. Premiums constituting measure of tax .............  $ <u>2,428,907.19</u>

   See Item 4, Part III, hereof.

8. Amount of tax (Item 7 multiplied by Item 6) ........  $ <u>80,153.94</u>

9. Deductions:

   Examination fees paid to or for the use of the State of Texas during taxable year. .................... $_____

10. Total Deductions ...............................  $_____

11. Net tax for Calendar Year .......................  $ <u>80,153.94</u>

———◆———

The printed form provided Connecticut General with an entirely correct and proper basis for making its own simple arithmetical ascertainment of its tax liability. All it needed to do to keep from paying more taxes than it owed was to examine its books and records and with the use of an adding machine arrive at the figures to be placed in the blank spaces left·for its convenience in items 3 and 4. Inasmuch as the record discloses that Connecticut General is one of the ten largest insurance companies in the United States, it is not a violent assumption that it had in its employ people entirely capable of analyzing its investments and people capable of using adding machines who, working together, could have provided the information for filling the blanks in both items 3 and 4. Once the blank spaces in items 3 and 4 were filled in, a seventh grade student could have ascertained Connecticut General's tax liability by following the directions in the printed form. The form even told how to

find the ratio of investments in Texas securities to investments in similar securities in the state of highest investment; "item 3 divided by item 4," it said. It then eliminated the necessity for knowledge of the taxing provisions of Art. 4769, V.T.C.S., by telling precisely what tax rate to apply to the ratio shown in item 5. Simple multiplication of the figure shown in item 7 by the tax rate would furnish the basic tax due and owing.

We recognized in Metropolitan Life Ins. Co. v. Mann, 140 Tex. 450, 168 S.W.2d 212, that reporting insurance companies are under a duty to conform their reports to the forms furnished to them by the Board of Insurance Commissioners whose statutory duty it is to prescribe them. Indeed, it was because Metropolitan had complied with an improper form in figuring and paying its taxes, and only for that reason, that we held the overpayment of taxes in that case to have been made under implied duress.

The situation is entirely different in this case. Here, the correctness of the form is not challenged. Yet here, Connecticut General did *not* conform its report to the form. It will be noted that although it filled in the space in item 3, thus showing the amount it had invested in Texas securities, it did *not* fill in the space in item 4 showing the amount of its investments in the state of highest percentage of investments. Had it done so and done so correctly, the certificate showing an excessive amount of taxes due, on which the Court now predicates implied duress, would never have issued. Connecticut General offers no reason or excuse for failing to complete the form properly. The failure to complete the form by accurately furnishing the information required by item 4 was either willful or negligent. Since Connecticut General had nothing to gain and all to lose by the failure, it is obvious that the failure was not willful but was negligent.

Although it had failed to give the information required by item 4, Connecticut General did show in the reports the ratio of its investments in Texas securities to its investments in securities of the state of the highest percentage of investment. In each of the reports for the years 1952–1957, the ratio is shown as "Less than 75%." Connecticut General does offer an excuse, but hardly a valid reason, for putting this erroneous information in the forms. A Vice-President, who is also counsel for the company, testified that he was acquainted with the sliding scale of rates in Art. 4769, and that at various times during the 1952–1957 period he inquired (the record does not show of whom) why the company was paying the highest rate of tax, and was advised that on the basis of rough calculations the ratio of investments was not even close to 75%. This is proof once again of negligence. That the reports of taxes due, required to be made under oath, were made on a basis of "rough estimates" rather than on a basis of accurate accounting is almost gross negligence.

In preparation for making the report for 1958, the Vice-President-witness had an accurate accounting made for the purpose of determining the ratio rate base for that year. Because of disclosures made by that accounting, he then had an accurate accounting made for the years 1952–1957, and discovered that for each year the actual ratio rate base was such as to require a tax rate of only 1.925 rather than 3.3.

As the Court points out, the statute requires that the annual tax reports be filed on or before March 1, and that the Board certify to the State Treasurer the amount of taxes due which must be paid by March 15. Some 200 or more insurance companies file the reports; and because of the brief period allowed for checking the reports, nothing more than a check of mathematical accuracy is made of reports which show the maximum tax rate to be due. If the tax is mathematically correct, the Board certifies to the State Treasurer the amount of the tax shown in the report. Thus it was that for each of the years in

question the Board certified to the State Treasurer that Connecticut General's tax was the same as shown in its reports. It is because of the issuance of these certificates that the Court holds that Connecticut General overpaid its taxes under implied duress. The conclusion is reached on the basis of certain language taken from Metropolitan Life Ins. Co. v. Mann, supra.

The language quoted from Metropolitan should be considered in its proper setting. Metropolitan was contending that if it had not paid the taxes unlawfully required of it by the erroneous form, its certificate to do business could have been withheld and thus that the payment was made under duress. The State was contending that even if Metropolitan had paid less tax than the form required, under a proper construction of the statutes it would have been subject to suit for the difference but its certificate could not have been withheld; that the threat of suit was not duress. We simply agreed with Metropolitan's construction of the statutes. In the course of so doing, we held that it is the duty of the Board to issue a correct certificate even if the report is incorrect. We did not hold that overpayments are made under duress when they are made according to a company's own negligent calculations which are accepted and certified to the State Treasurer by the Board.

Connecticut General paid its taxes by check for each of the years in question. In each instance its check for the sum at which it had calculated its taxes was transmitted to the Board coincident with the filing of the report. At that time no certificate had been issued; and there surely can be no basis for saying that the tender of payment of an excessive amount was made under duress. Finding the mathematics of the reports to be correct, the Board issued its certificates and accepted and transmitted the checks to the State Treasurer. The overpayments were thus not pursuant to the certificates but were pursuant to Connecticut General's own negligence. Any implied duress arising from the certificates could hardly operate retrospectively.

There is yet another reason why Connecticut General cannot predicate duress on the Board's certificate. *It never knew of the certificate.* It was stipulated by the parties that Connecticut General never received any communication of any kind from the Board relative to its tax liability during the years in question, and there is no proof that it received a copy of the certificate from any other source.

Implied duress in this area of the law rests on threats. There must be an illegal or unwarranted demand for payment with provision in the law for the application of hurtful business sanctions if one refuses to meet the demand. In this situation the courts have held that one acts under duress even though no actual threat to invoke the sanctions has been made; that inasmuch as the sanctions are available, the demand *implies* a threat that they will be invoked. Now how can one having no knowledge of a demand act under an implied threat to invoke sanctions if he does not meet the demand?

All of the cases cited by the Court in which recovery has been allowed are cases in which payment was made in response to a known demand for the amount paid. In Austin Nat. Bank v. Sheppard, 123 Tex. 272, 71 S.W.2d 242, the Secretary of State demanded and received a filing fee of $2,500 which was not authorized by law. In National Biscuit Co. v. State, 134 Tex. 293, 135 S.W.2d 687, the payments recovered were made in accordance with the known demands of unconstitutional statutes. In Metropolitan Life Ins. Co. v. Mann, 140 Tex. 450, 168 S.W.2d 212, payment was pursuant to the known demand of an unauthorized printed form. In State v. Akin Products Co., 155 Tex. 348, 286 S.W.2d 110, payment was in accordance with known demands of a State Commission pursuant to an unconstitutional statute.

Other cases of like result may be cited; but they, too, involved payments made in

response to known demands. In Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, payment of the gross receipts taxes or fees was pursuant to the known demands of an invalid city ordinance. In State v. Tennessee Gas Transmission Co., Tex.Civ.App., 289 S.W.2d 309, writ refused, n. r. e., and State v. Transcontinental Gas Pipe Line Corp., Tex.Civ.App., 292 S.W.2d 826, writ refused, payment was according to the known demands of an unconstitutional statute.

That a known demand is basic to a right of recovery of taxes paid under implied duress is the clear implication of Corsicana Cotton Mills v. Sheppard, 123 Tex. 352, 71 S.W.2d 247, in which recovery was denied. In that case, as in this, there was an overpayment of taxes. The overpayment was based on the taxpayer's misconstruction of franchise tax statutes. In denying recovery, the Court said:

> "As we understand this record, the secretary of state never at any time made any demand on relator to pay franchise taxes for the years involved in this claim on its capital set-up employed outside this state. Furthermore, in our opinion this record contains no evidence that can reasonably be interpreted as showing or tending to show, that the secretary of state, the Attorney General, or any other state authority ever made any ruling or demand that would have justified relator in paying the taxes here involved on its capital set-up employed outside the state." 71 S.W.2d 248.

Replying to a contention that statements in the report forms relating to penalties constituted implied duress, the Court said:

> "We have carefully read the above information contained in blank forms as above indicated, and we find nothing therein that can be construed as a contention that the taxes here involved were claimed or demanded by the state or any state authority." 71 S.W.2d 250.

In the instant case the only demand known by Connecticut General was the demand of Art. 4769 for a sliding scale percentage of its gross Texas premiums for the preceding year, the percentage to be based on the ratio of its investments in Texas securities to its investments in securities of the state of its highest percentage of investment. Its overpayment of taxes was because of its own negligence in failing accurately to comply with the demand. Its situation here is as though no certificate of the Board had been issued. It is the same as if one had incorrectly calculated and overpaid a gross receipts tax imposed by an unconstitutional statute or an invalid city ordinance; he would have paid the tax demanded or required by the statute or ordinance under implied duress, but the excess would not have been paid under implied duress.

I respectfully suggest that the holding of duress in this case extends that concept beyond reality; that it makes the concept of acts done under duress and the concept of acts done by mistake or by reason of negligence legal equivalents.

Connecticut General advances two other theories for allowing recovery: (1) that the overpayment of taxes was made as a result of a unilateral mistake in the nature of a clerical error, and (2) that it was made as a result of a mutual mistake of the parties. Recovery is not allowed by the Court on either theory. Assuming the theories to furnish sound and accepted legal bases for recovery in this jurisdiction, an assumption for which there is no support in decided cases, there is simply no evidence to support them.

The evidence attending Connecticut General's overpayment has been summarized. Testimony that someone in the organization told the Vice-President-witness that on the basis of rough calculations the ratio of investments had not reached 75% is not evidence of a unilateral mistake "in the nature of a clerical error," such as was held in Taylor & Son Inc. v. Arlington

Independent School District, 160 Tex. 617, 335 S.W.2d 371, to relieve a bidder of the legal consequences of an erroneous bid. Moreover, the evidence is pure hearsay and does not prove the truth of what it purports. Aetna Ins. Co. v. Klein, 160 Tex. 61, 325 S.W.2d 376. Evidence that the Board certified erroneously the amount of taxes due does not establish that the overpayment was the result of a mutual mistake. From the standpoint of Connecticut General, the erroneous report was, on the record before us, the result of negligence. From the standpoint of the Board, the erroneous certificate was the result of failing to obtain and check all records necessary to the making of a correct certificate.

It is too obvious to warrant discussion that it is unjust for the State to keep the overpayments of taxes made by Connecticut General. It was also unjust for the State to keep the overpayments of the taxpayer in Corsicana Cotton Mills v. Sheppard, supra. Perhaps the time has come to re-evaluate the relationship between the taxpayer and his government, and to require that government disgorge monies received by it to which it is not justly entitled and which it should not in good conscience retain. Government is no more entitled to be unjustly enriched at the expense of its citizens than is one citizen at the expense of another. Although finding implied duress in Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, this Court's primary concern was with the City's moral conduct as is evidenced by this language (209 S.W.2d 925):

> "The city received from the companies money to which it now appears it was not entitled and, under the circumstances detailed, it would not be just for the city to continue to retain the money. * * * It would be against good conscience for the city not to pay back to petitioners the money thus received."

I would look with favor on a holding that a taxpayer is entitled to recover taxes paid in excess of the amount he justly owes under a proper construction of taxing statutes, once the overpayment is established by a judgment of a court of competent jurisdiction. A holding of that character would permit recovery of excess ad valorem taxes voluntarily but negligently paid by a widow in response to a statement of a tax collector who has made a mathematical error in his computation of taxes due. But until a rule of law is adopted which with equal certainty authorizes a recovery of the "widow's mite," I am unwilling to pile fiction of knowledge of demand upon fiction of threats in order to reimburse Connecticut General's half a million paid voluntarily but negligently. Rules of law should apply to all alike.

Since affirmance here rests on a holding of implied duress and I can find no basis in the record for the holding, I must dissent.

CULVER, WALKER and HAMILTON, JJ., join in this dissent.