**LINCOLN NATIONAL LIFE INSURANCE COMPANY, Appellant,**

v.

**STATE of Texas, et al., Appellees.**

**No. 13606.**

Court of Appeals of Texas, Austin.

April 22, 1982.

Rehearing Denied May 12, 1982.

David C. Duggins, Clark, Thomas, Winters & Shapiro, Austin, for appellant.

Mark White, Atty. Gen., Catherine Fryer, Asst. Atty. Gen., Austin, for appellees.

PHILLIPS, Justice.

The question before us is whether appellant can recover 1976 gross-premiums-receipt taxes which it mistakenly overpaid. At all times relevant to this cause of action, appellant has been subject to the payment of gross-premiums-receipts taxes under Tex.Rev.Civ.Stat.Ann. art. 4769 (1981).

The trial court held these erroneously paid taxes were not recoverable. We reverse the judgment of the trial court and render judgment that appellant be reimbursed the monies paid in error.

This suit was authorized by the State and was instituted by appellant for the purpose of recovering an overpayment of gross-premiums-receipt taxes for the year 1976. It is undisputed appellant overpaid its 1976 taxes by $179,465.44. The overpayment arose out of the following circumstances: appellant is a foreign life insurance company doing business in Texas and, accordingly, is subject to the occupation tax imposed by article 4769. The tax is imposed on the gross amount of insurance premiums collected during the preceding year from Texas residents and domiciliaries. The rate of tax varies from a maximum of 3.3 per cent to a minimum of 1.925 per cent depending upon a formula which, in essence, lowers the amount of gross receipts a foreign company must pay as it invests more of its assets in Texas securities as compared to the state in which it has the highest percentage of its admitted assets invested.

Appellant is an Indiana corporation and erroneously assumed that its parent state, Indiana, was that in which it had the greatest amount of its admitted assets invested. Appellant later discovered that, in fact, it had invested the greatest amount of its admitted assets in Delaware and that Delaware, rather than Indiana, should have been compared with Texas in order to determine the appropriate rate of the Texas tax.

When its error was discovered, appellant had already filed its 1976 tax return. That return, using Indiana as the comparison state, showed a tax rate of 2.75 percent and a resulting tax of $597,272.12.

After discovery of the mistake, appellant filed an amended 1976 tax return using Delaware as the comparison state. This resulted in a tax rate of 1.925 percent and a tax for 1976 of $417,806.68. As Lincoln had forwarded payment simultaneously with the original return, it requested a refund of the difference between $597,272.12 and $417,806.68, or $179,465.44. Despite the fact the State's extensive review revealed appellant's amended tax return to be accurate, and the existence and amount of the overpayment were conceded by the State, the State refused to refund the excess. Consequently, Lincoln instituted suit.

Appellant is before us on a number of points; however, as we sustain its first point, we need not reach the remainder.

Appellant's first point of error is that of the trial court in concluding the overpayment of taxes in question did not constitute payment under duress since duress was established as a matter of law.

The sole question for decision arises from the general proposition of law, that one who voluntarily overpays a tax has no legal claim for its repayment, but one who pays more tax than the law requires, under duress, has such a claim. *Austin National Bank v. Sheppard*, 123 Tex. 272, 71 S.W.2d 242 (1934). *See also San Antonio Independent School Dist. v. National Bank of Commerce*, 626 S.W.2d 794 (Tex.Civ.App.1981, no writ).

In our judgment, disposition of the case on appeal is controlled by *State v. Connecticut General Life Insurance Co.*, 382 S.W.2d 745 (Tex.1964), which requires reversal of the trial court's judgment. The trial court declined to follow *Connecticut General* due to the amendment of Tex.Ins.Code Ann. art. 1.14 in 1959,[1] under which certificates of authority are now valid until revoked according to law, rather than subject to annual renewal.

Connecticut General Life Insurance Company obtained legislative permission to sue the State for recovery of overpayments of its gross receipt taxes under article 4769 for the years 1952 through 1957, inclusive, and for 1959. Rather than instituting an exhaustive accounting, Connecticut General simply paid its taxes at the maximum rate of 3.3 per cent for 1952 through 1957, and paid at the rate of 2.2 per cent for 1959. Based on stipulated facts, it was determined Connecticut General's actual tax rate for each year in controversy, using the correct determination of Texas securities, was the minimum rate of 1.925 per cent.

The Texas Supreme Court in *Connecticut General* commenced its discussion by noting article 4769 mandates that companies like Connecticut General (and appellant here) file an annual statement of its gross-Texas-premiums receipts on or before the first day of March of each year and requires the Insurance Commissioner to certify to the State Treasurer the amount of taxes due, which must be paid on or before the following March 15th.

The Texas Supreme Court noted Connecticut General had timely filed its returns and that the Insurance Commissioner had merely certified the taxes were due as shown on the face of the returns, with the taxes being paid as certified. The Court wrote:

These remittances by Respondent of the amounts certified by the Board were prerequisite to the right of Respondent to the issuance of a permit to continue its business in Texas. Article 4.05 of the Insurance Code, Vol. 14, V.A.T.S., provides, in part:

Upon the receipt of sworn statements showing the gross receipts of any insurance organization, the Board of Insurance Commissioners shall certify to the State Treasurer the amount of taxes due by such insurance organization for the preceding year, which taxes shall be paid to the State Treasurer for the use of the State, by such company. Upon his receipt of such certificate and the payment of such tax, the Treasurer shall execute a receipt therefor, which receipt shall be evidence of the payment of such taxes. *No such life insurance company shall receive a certificate of authority to do business in this State until such taxes are paid.* [382 S.W.2d at 746 (emphasis appearing in original)].

After thus outlining the facts and applicable statutes, the Court proceeded to discuss the governing law, remarking:

This Court has consistently held that the voluntary payment of an illegal tax will not support a claim for repayment; but that a payment under duress, which may be either express or implied, is not a voluntary payment and may be recovered. [citations deleted].

The crucial test is whether the taxpayer acted under duress... [*Id.* at 746–47].

The Court then contrasted two contemporaneous prior cases, *Corsicana Cotton Mills v. Sheppard*, 123 Tex. 352, 71 S.W.2d 247

---

1. For the pertinent version of art. 1.14 § 1, in effect prior to the 1959 revision, see 1951 Tex. Gen.Laws, ch. 491.

(1934), and *Austin National Bank v. Sheppard*, 123 Tex. 272, 71 S.W.2d 242 (1934), the former resulting in a finding of no duress and the latter resulting in a finding of duress. In *Corsicana Cotton Mills*, the Court refused to issue a writ of mandamus where the relator, through its erroneous construction of law, paid unnecessary franchise taxes. There, however, the State never made any *demand* for payment of the taxes and the relator failed to furnish the Secretary of State with any information from which he could discern an overpayment was being made. Further, there existed, at that time, no statutory provision authorizing the refund of erroneously paid franchise taxes.

The Court in the *Austin National Bank* case, on the other hand, granted mandamus, finding the payment of filing fees by a foreign corporation was recoverable as a payment made under implied duress where refusal to pay the fee would have involved the *risk* of forfeiture of the corporation's right to do business in the state and its ability to resort to the courts. The principal factors found to illustrate the implied duress necessitating a refund were: 1) the imposition of resort to suit if the petitioner refused to pay the tax; 2) risking its right to do business in the state being called into question; and 3) the hazard of having its business hampered or injured by the conflict.

Having emphasized the importance of making the determination of duress in an official demand for payment, the significance of a statutory penalty provision to enforce payment, and the existence of information from which the taxing official could determine the correct payment amount, the *Connecticut General* Court proceeded to review another case factually similar to both *Connecticut General* and the instant case, *Metropolitan Life Insurance Co. v. Mann*, 140 Tex. 450, 168 S.W.2d 212 (1943). *Metropolitan* concerned overpayment of occupation taxes by a foreign corporation. The form issued by the Commissioner contained errors and demanded more tax than could be legally requested. The State argued the taxes were not paid under duress as the Insurance Commissioner was not authorized to refuse to issue a renewal permit to a life insurance company if it paid the taxes required by its report. In other words, the State contended the right to withhold a renewal certificate depended exclusively on whether the taxes shown in the report were paid, regardless of whether the report portrayed the amount actually due. The *Metropolitan* court noted the Commissioner is required by statute to certify to the State Treasurer the amount of taxes due and that he is not limited, in his certification, to the sum reiterated in the report if such is inaccurate. In the language of the Court:

> The statute requires the Commissioner to certify to the State Treasurer the amount of taxes due. Certainly this does not confine the Commissioner's certificate to the amount shown by a report if such report is incorrect. To so hold would be to add something to the statute not contained therein. The statute says that "the Commissioner of Insurance shall certify to the State Treasurer the amount of taxes due by such company for the preceding year, . . . ." The construction contended for by the respondents would call on us to add to the statute, the additional provision, *as shown by such report*, and would compel the Commissioner to issue a renewal certificate even though he knew the insurance company involved had not reported all taxes due. [*Id.* at 215 (emphasis in original)].

*Metropolitan* is, of course, distinguishable from *Connecticut General* as *Metropolitan* involved a prescribed tax return form, which, if literally followed, automatically resulted in a demand for a higher tax than that imposed by the statute. This distinction, however, was considered by the *Connecticut General* to be without significance because in *Metropolitan* and *Connecticut General* (and the instant case) the wrong amount was certified and *the certification itself* was held to be a demand for payment of the wrong tax, resulting in payment under legal duress.

In closing its opinion, the *Connecticut General* Court noted that its conclusions were unaffected by the fact (also established in the instant record) insurance companies routinely tender their payment, in the amount shown on their report, at the same time they send the report itself and that the Insurance Commissioner, due to time and personnel constraints, routinely certifies the amounts shown on the reports and transmits the payments to the Treasurer.

 The State attempts to distinguish *Connecticut General* from the case on appeal on the theory the 1959 amendment to the Texas Insurance Code art. 1.14 eliminated duress. Prior to that amendment, art. 1.14 provided a certificate of authority for an insurance company was effective "for the period of not more than fifteen (15) months, and not extending more than ninety (90) days beyond the last day of February next following the date of said certificate." By 1959 Tex.Gen.Laws, ch. 194, at 434, effective May 21, 1959, the quoted portion of the statute was changed to read: "Each such certificate of authority heretofore or hereafter issued shall be in full force and effect until it is revoked, cancelled or suspended according to law; provided, however, that failure to file any annual statement required by law will subject the certificate of authority to being revoked, cancelled or suspended." Section 2 of the amendatory act also repealed other statutes to the extent that they required periodic renewal of certificates of authority. According to the State's theory, the fact that a failure to pay the taxes certified by the Insurance Commissioner no longer results in a self-executing loss of the taxpayer's authority to do business in Texas, but that an action must now be brought to forfeit such authority, removes the "duress" upon which *Connecticut General* was based and destroys the controlling effect of *Connecticut General* on this case. Although an argument can be made that article 1.10(7) of the Texas Insurance Code, as in force in 1976, still provided for summary loss of the certificate, in any event, duress may be implied from the institution of administrative or legal proceedings as well as from the summary forfeiture of authority to do business.

The judgment of the trial court is reversed and judgment here rendered for appellant in the amount of $179,465.44.