Coleman H. SMITH, et al.

v.

TRAVIS COUNTY EDUCATION DISTRICT, et al.

CONNELL ESTATES, et al.

v.

TRAVIS COUNTY EDUCATION DISTRICT, et al.

Civ. Nos. A–92–CA–75, A–92–CA–81.

United States District Court, W.D. Texas, Austin Division.

May 1, 1992.

1172

James H. Keahey, Austin, Tex., for Coleman H. Smith, and all other taxpayers in Texas similarly situated.

Mark L. Perlmutter, law offices of Mark L. Perlmutter, Frank Powell, Powell & Associates, Austin, Tex., for The Connell Estates, Nations Bank, N.A., Giles W. Dalby, Elizabeth Dalby Elliott, Rebecca Dalby

Whitmire, Alan B. Connell, Jr., Lee D. Vendig, Sara S. Jackson, Mary S. Forbes, Paul G. Spining, Jr., Colleen Spining, Sara Jane Spining Caswell, Richard Lawrence Spining, Jr., Shannon Ann Spining, James D. Howell, Heidi Dole Howell, Mathew Andre Howell, Giles C. McCrary, Louise McCrary, Mary McCrary Brewer, Craig Wallace, CPR Energy, Hattie Bess Park, Alan B. Connell, George W. Spining, Ruth N. Spining, Paul G. Spining, III, Robert C. Park, Harry M. Park, Jr., Stephenville Bank and Trust, Mary Park Lilly, John Lott, Ryla T. Lott, John F. Lott, Jr., Patricia Lott Kirkpatrick, 4JK, Inc., LLB, Inc., Pollard & Lott, Inc., M. Frank Powell, Lee D. Vendig, Michael H. Shelby, Jeanne F. Shelby, Jeanne F. Shelby Agency, Patrick B. Shelby, New Waskom Gas Gathering, Inc., Robert B. Payne, Jr., and all consol. plaintiffs.

William H. Bingham, McGinnis, Lochridge & Kilgore, Austin, Tex., for Travis County Educ. Dist., et al.

Toni Hunter, Atty. General's Office, Austin, Tex., for Dan Morales.

James R. Raup, McGinnis, Lochridge & Kilgore, Austin, Tex., for County Educ. Dist. No. 11.

William M. Buechler, Henslee, Ryan & Groce, Austin, Tex., for County Educ. Dist. No. 24, Coleman County Educ. Dist., Collin County Educ. Dist., County Educ. Dist. No. 26, County Educ. Dist. No. 31.

John Pierce Griffin, Nichols, Jackson, Kirk & Dillard, Austin, Tex., for Dallas County Educ. Dist.

Earl Luna, Dallas, Tex., for Denton County Educ. Dist.

D. Kirk Swinney, Roy L. Armstrong, McCreary, Veselka, Bragg & Allen, Austin, Tex., for Runnells County Educ. Dist.

John Crumpton Hardy, III, Hardy & Atherton, Tyler, Tex., for Smith County Educ. Dist.

## ORDER

NOWLIN, District Judge.

The basic issue before this Court is whether a federal court can and should enjoin the collection of taxes under a tax system that violates the state's own constitution, where the state's own highest court, although holding the tax system unconstitutional, further declared that the declaration of unconstitutionality under the state constitution cannot be used as a defense by taxpayers to avoid payment or to seek refunds of taxes due and that will be due in the future under the unconstitutional system.

## I. The Background of This Issue

In its most recent opinion relating to the school finance system, the Texas Supreme Court provides a detailed discussion of the controversy and the litigation that has occurred and continues to occur with respect to public education in the State of Texas. *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 494–99 (Tex.1992) ("*Edgewood III*"). Twice before *Edgewood III*, The Texas Supreme Court had addressed the State's school finance system. *See generally: Edgewood Independent School District v. Kirby*, 777 S.W.2d 391 (Tex. 1989) ("*Edgewood I*"); *and* 804 S.W.2d 491 (Tex.1991) ("*Edgewood II*"). The *Edgewood III* decision pertains directly to the present cause of action.

In *Edgewood III*, the main issue before the Texas Supreme Court was whether the current school finance system, as created by Senate Bill 351, was constitutional under the State Constitution. *Edgewood III*, at 493. Numerous school districts and individual citizens challenged the [state] constitutionality of this system. *Id.* The State of Texas and other school districts and citizens argued that the most recent enactment by the State legislature was constitutional under the State constitution. *Id.* Most, and practically all, of the taxpayers in this suit were not before the Texas Supreme Court in *Edgewood III*, but the effect of the *Edgewood III* decision was upon all of the property taxpayers in the state. The Texas Supreme Court held that this legislative enactment violated two separate provisions of the State constitution. *Id.* at 493. The Texas Supreme Court summa-

rized the school finance system created by Senate Bill 351:

... Senate Bill 351 retains the same historical reliance upon local ad valorem taxes to fund most of the state cost of education. To ameliorate disparities among school districts due to local property wealth, Senate Bill 351 creates 188 county education districts. Most of these CEDs consist of school districts in a single county, although some of them include school districts in more than one county. CEDs have only tax functions; they perform no educational duties.... CEDs do not even determine their own tax rate. The rate is effectively prescribed by statute.... The CEDs sole function is to levy, collect, and distribute property taxes as directed by the Legislature.

There is an overall "revenue limit" for local school districts, defined as an amount equal to 110 percent of the state and local funds guaranteed ... per student to *each* school district taxing at a [specified rate].... This limit does not appear to be uniform, comprehensive or absolute.... [I]t is not a single amount which applies equally to all school districts, nor does it encompass all local revenues, nor does it absolutely bar

transgression. Each district evidently has its own revenue limit, annually estimated by and certified to that district by the commissioner of education.

Finally, the commissioner of education determines the State's share of the costs of ... by subtracting what the district is due from the CED funds and what the district has collected from state available school funds. [The commissioner] then grants and approves a warrant for the difference. If state appropriations prove insufficient, however, the commissioner will reduce each district's allocation.

Thus, since *Edgewood I*, some aspects of the public school system have been changed, but others have not.... The State has moved from encouraging school districts to contribute local tax revenue, to conditioning state funds on such contribution, to mandating a specified contribution.... It has accomplished this, however, by requiring the taxpayers in one school district, without a vote of approval, to fund the schools in other districts over which they have no control. These changes present the constitutional issues now before us.

*Edgewood III*, at 498–99 (citations and footnotes omitted).[1]

---

1. The following is the portion of the Texas Supreme Court's opinion summarizing the system:

... Senate Bill 351 still provides a two-tiered program. The first tier "guarantees sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards." ... This basic allotment, in addition, is subject to adjustment, *e.g.*, for the district's local "cost of education," and supplementation by "special allotments" for matters ranging from special education to "technology funds." Each district is guaranteed these basic and special allotments.

Senate Bill 351, however, mandates that each CED shall raise for this first tier an assigned "local share," defined as the product of a specified tax rate and the taxable value of property within the CED. The tax rate per hundred dollars of valuation is set for each school year.... Senate Bill 351 also commands that each CED "shall levy" an ad valorem tax at a rate sufficient to collect its assigned local share. The commissioner of education notifies each CED of the amount due each component school district under the statute and sets the schedule for distributions.

Tier two aspires "to provide all school districts with substantially equal access to funds to provide an enriched program and additional funds for facilities" with the "opportunity" to supplement as they should choose. In simplified form, the tier two formula guarantees each school district a specified amount per student ... for each cent of tax effort over that already assigned to the CED. The ... statute caps a district's "enrichment and facilities tax rate," or "DTR,"....

There is a second, independent limit on each school district's tax rate.... These annual limits, if combined with the actually increasing CED tax rate, result in a maximum rate of $1.50 per $100 valuation each tax year. The gap between the annually decreasing caps on school district tax rates ... and the constant cap on each district's "DTR" in tier two ... steadily decreases.... The effect of this is to reduce a district's ability to raise unequalized revenue—the so-called "third tier" of school finance.

*Edgewood III*, at 498–99 (citations and footnotes omitted).

**II. The Parties and Issues of this Case**

Various taxpayers affected by this tax system created by Senate Bill 351 seek injunctive and declaratory relief regarding the taxes due for the 1992 year. These taxpayers also seek declaratory relief regarding the taxes due and paid for the 1991 year. This court has previously certified this action as a class action with respect to the plaintiffs and the defendants. As a practical matter, the plaintiffs face a state remedy that is unavailing and a dilemma that procedurally is so tangled as to make Gordian's Knot look like a simple square knot. As Alexander's sword remedied Alexander's own dilemma, the United States Constitution provides the plaintiffs with a remedy.[2] Because of the complexities and seriousness of the issues involved in this case, a detailed discussion of the legal principles is warranted.

**A. *Jurisdictional Issues***

The defendant County Education Districts and the defendant-intervenors Texas Education Agency and the Attorney General of the State of Texas raise numerous jurisdictional arguments that this Court either lacks jurisdiction to hear these causes of action or should abstain from hearing these causes of action. This Court will address all of the issues raised by the defendants.

■ If the Court finds that this action is not barred by 28 U.S.C. § 1341, then this Court has jurisdiction to hear this cause of action under the general federal jurisdiction statute and under the more specific civil rights jurisdiction statute. 28 U.S.C. Section 1331 states:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331. More specifically, 28 U.S.C. Section 1343 states in pertinent part that:

> (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
> ... (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; ....

28 U.S.C. § 1343. Under the jurisdiction conferred by 28 U.S.C. § 1343(a)(3), there is no distinction between personal liberties and property rights. *Lynch v. Household Finance Corporation*, 405 U.S. 538, 542–543, 92 S.Ct. 1113, 1117, 31 L.Ed.2d 424 (1972).

The Fifth Amendment to the Constitution of the United States guarantees in pertinent part that:

> ... *nor shall any person ... be deprived of life, liberty, or property, without due process of law;* ...

U.S. Const. Amend. 5. The Fourteenth Amendment of the United States Constitution states in pertinent part:

> **Section 1....** *No state shall* make or *enforce* any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of* life, liberty, or *property, without due process of law;* nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. 14 § 1. The due process rights guaranteed by both the Fifth Amendment and the Fourteenth Amendment protect individuals as extensively from the state government, as from the national government. *Curry v. McCanless*, 307 U.S. 357, 370, 59 S.Ct. 900, 907, 83 L.Ed. 1339 (1939).

The specific dictates of due process generally requires three factors to be considered:

> First, the private interest that will be affected by the official action; second,

---

**2.** The holding of *Ex Parte Young* permits the Fourteenth Amendment "to serve as a sword, rather than merely as a shield, for those whom [it] was designed to protect." *See Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and the administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *see also Memphis Light, Gas & Water v. Craft,* 436 U.S. 1, 17–18, 98 S.Ct. 1554, 1564, 56 L.Ed.2d 30 (1978).

The Supreme Court has recently interpreted the Due Process Clause as it applies to the Tax Injunction Act. Writing for a unanimous Court, Justice Brennan affirmatively stated:

> To satisfy the requirements of the Due Process Clause, ... the State must provide taxpayers with, not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a "clear and certain remedy" for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one.

*McKesson v. Division of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 39, 110 S.Ct. 2238, 2251, 110 L.Ed.2d 17 (1990) (footnote and citations omitted). Indeed,:

> Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause.

*Id.,* 496 U.S. at 36, 110 S.Ct. at 2250.[3] The Defendants all argue that the issue before this Court is purely one of state law. The Defendants argument is incorrect.

 Many property interests attain federal constitutional status because of their initial recognition and protection by state law; and, the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. *See Paul v. Davis,* 424 U.S. 693, 710–711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976).[4]

> Although the underlying substantive interest is created by an "independent source such as state law," federal constitutional law determines whether that interest rises to the level of a "legitimate

---

**3.** In 1912, before the passage of the Tax Injunction Act, Justice Holmes has discussed state taxes where the aggrieved taxpayer need only merely object and not face any possible action, such as a distress action, by the state:

> It is reasonable that a [person] who denies the legality of a tax should have a clear and certain remedy. The rule being established that apart from special circumstances [the person] cannot interfere by injunction with the State's collection of its revenues, an action at law to recover back what he has paid is the alternative left.

*Atchison, T. & S.F.R. Co. v. O'Connor,* 223 U.S. 280, 285–286, 32 S.Ct. 216, 217, 56 L.Ed. 436 (1912); *quoted in McKesson,* 110 S.Ct. at 2248. Long before the Tax Injunction Act, the Court had recognized the inherent responsibility of the federal courts from interfering with the collection of state taxes. Justice Holmes proceeded to explain that when a party is under implied duress to pay a tax and the party does indicate a protest to that which the party cannot prevent:

> [I]f at the same time the citizen is put at a serious disadvantage in the assertion **of his legal, in this case constitutional, rights,** by defence in the suit, justice may require that he

should be at liberty to avoid those disadvantages by paying promptly and bringing suit....

*Id.*

**4.** In *Paul v. Davis,* the Court stated that:

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly held that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.
> ....
> In each of these cases, as a result of state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained

claim of entitlement" protected by the Due Process Clause.

*Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (citations omitted). The Fourteenth Amendment places procedural constraints on government action that deprives interests recognized as "property" within the meaning of the Due Process Clause. *Id.* Additionally, when applying the Due Process Clause of the Fourteenth Amendment, the federal courts do not distinguish among different types of property. *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 608, 95 S.Ct. 719, 723, 42 L.Ed.2d 751 (1975).

■] In *McKesson,* the Supreme Court in no way limited its holding to state taxes that are only in violation of the United States Constitution. The Due Process Clause applies to any *unlawful collection* of taxes.[5] After invalidating a state tax scheme on Commerce Clause grounds, the *McKesson* Court left the state courts with the initial duty upon remand of crafting "appropriate relief in accord with both federal and state law." *McKesson,* 496 U.S. at 32 n. 16, 110 S.Ct. at 2248 n. 16.

■ In an action reversing the holding of a State's highest court that relief could not be had in any suit at law from allegedly [federal] unconstitutional conduct, the United States Supreme Court explained that the practical effect of the decision by the State's highest court deprived the plaintiff of property without affording the plaintiff any opportunity to be heard. *Brinkerhoff-Faris Trust & Savings Co. v. Hill,* 281 U.S. 673, 678, 50 S.Ct. 451, 453, 74 L.Ed. 1107 (1930). Although the state courts determine the adjective and substantive law of the state, the state courts must, in so doing, accord the parties due process. *Id.,* 281 U.S. at 682, 50 S.Ct. at 454.

Whether acting through its judiciary or through its Legislature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless,

there is, or was, afforded to him some real opportunity to protect it.

*Id.,* 50 S.Ct. at 454–455. The guarantee of due process under the federal constitution extends to state action through the State's judicial, legislative, executive, or administrative branches. *Id.,* 281 U.S. at 680, 50 S.Ct. at 454.

**B.** *Class Certification Issues*

■] This portion of the opinion and judgment is to clarify and reiterate this Court's certification of a class action, following an evidentiary hearing. Rule 23 of the Federal Rules of Civil Procedure provides the guidelines and standards for certifying and maintaining class actions. To qualify as a class action, the proposed class must initially meet all four requirements of subdivision (a) of Rule 23, commonly referred to as "numerosity," "commonality," "typicality," and "adequacy of representation":

(a) Prerequisites to a Class Action.

One or more members of a class may sue or be sued as representative parties on behalf of all only if[:]

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The proposed plaintiff class meets all four of the requirements set out in subdivision (a).

■ The Supreme Court has upheld the designation of a *nationwide* class action despite arguments concerning such a large and geographically diverse class. *See California v. Yamasaki,* 442 U.S. 682, 701–702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). The Court stated that the limitations on class size that are associated with (b)(3) actions do not apply to (b)(2) actions. *Id.* The Court also noted that a nationwide

---

in the Due Process Clause of the Fourteenth Amendment.....

.... [A]ny [such] right vouchsafed to [a person] by the State [is] thereby protected by the Fourteenth Amendment. *Id.* 424 U.S. at 710–712, 96 S.Ct. at 1165–1166.

**5.** This Court finds it more compelling that the tax at issue has been found not to merely violate a state statute but rather the tax scheme at issue has been declared to violate two distinct provisions of the Constitution of the State of Texas.

class is consistent with equity jurisprudence, because the scope of the relief depends upon the alleged violation and not the geographical extent of the class. *Id.* When asked to certify a nationwide class, a federal court should ensure that nationwide relief is appropriate and that such certification would not improperly interfere with litigation of similar issues in other districts. *Id.* Numbering in the millions, this class is clearly so numerous that joinder of all members would be impracticable.

In *Califano,* the Supreme Court noted that class relief is peculiarly appropriate when:

> The issues involved are common to the class as a whole. They turn on questions of law applicable in the same manner to each member of the class. The ultimate question is [the same] ... It is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue. And the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.

*Id.,* 442 U.S. at 701, 99 S.Ct. at 2557.

"Commonality" requires that the resolution of common issues affect all or most of the class members. *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 469 (5th Cir.1986) (citations omitted). The main dispute is a legal issue that is common to the entire class with a requested remedy that is also common to the class.

■ "Typicality" concerns primarily the legal and remedial grounds for the claims of the named and unnamed members. *Id.* (citations omitted). A strong similarity of legal theories will satisfy the typicality requirement even if substantial factual distinctions exist between the named and unnamed class members. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) (citations omitted). When the similarity of legal theories is so strong that it overrides whatever factual differences might exist and mandates a determination that the named members' claims are typical of those of the class. *Id.* The legal theory

for relief asserted by the representative class is typical of the claims of the class.

The "adequacy of representation" requirement concerns both the class representatives and the class counsel. *Jenkins,* 782 F.2d at 469. This requirement mandates an inquiry into the zeal and competency of the class counsel and the ability of the named members to take an active role in and control of the litigation to protect the unnamed members. *Horton v. Goosecreek Independent School District,* 690 F.2d 470, 484 (5th Cir.1982) *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983). The attorneys for the representative parties and the representative parties will fairly and adequately protect the interests of the class.

■ The plaintiff taxpayers seeking a class action have met their burden of proof on the class certification issues. *Id.* at 486 (citation omitted). "Judges should err in favor of certification." *Id.* at 487. A large class may be certified even if unanimity of opinion between members can never be achieved. *See id.* District courts have great discretion in certifying and maintaining a proposed class action, and such a decision may only be reversed upon a showing of abuse of discretion." *Montelongo v. Meese,* 803 F.2d 1341, 1351 (5th Cir.1986) *cert. denied* 481 U.S. 1048, 107 S.Ct. 2179, 95 L.Ed.2d 835 (1987).

■ If the action meets all four of the requirements set out in subdivision (a), the action may be maintained as a class action if the action also conforms to at least one of the three requirements of subdivision (b). Specifically, this action should proceed as a "(b)(2)" class action. Subdivision (b)(2) of Rule 23 permits the certification of a class if:

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; ....

Fed.R.Civ.P. 23(b)(2). The plaintiffs in this class action seek both declaratory and injunctive relief on grounds that are general-

ly applicable to the class and any relief would be appropriate to the class as a whole.[6] As a Rule 23(b)(2) class, there is no right to opt out of class actions that proceed to a final judgment by the court. *See Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506–507 (5th Cir.1981) (holding that this prohibition also applies to a settlement of a(b)(2) class action).

There are two other types of class actions that are maintainable, pursuant to subdivision (b). Fed.R.Civ.P. 23(b)(1 and 3).[7] This class action could probably be properly maintained under these other two classifications, as well, but this Court does not so decide.

■ Rule 23 does not require notice be given to the members of a(b)(2) or (b)(1) class actions. When a class has been certified under Rule 23(b)(2), absent class members are not required to receive notice or to have the opportunity to opt out of the suit. *See Equal Employment Opportunity Commission v. General Telephone Co.*,

599 F.2d 322, 334 (9th Cir.1979) *affirmed* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, n. 14, 94 S.Ct. 2140, 2152, n. 14, 40 L.Ed.2d 732 (1974). No notice is required for the absent members of either the plaintiff class or the defendant class in this action.

The defendants in this action have also been certified as a class under Rule 23(b)(2) and (b)(1).

If a class is certified and maintained through the final judgment in an action, Rule 23 imposes certain requirements on the contents of judgments:

> (3) The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2) whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class....

Fed.R.Civ.P. 23(c). In a (b)(1) or (b)(2) class action, the judgment needs only describe

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impeded their ability to protect their interests; or
> ....
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(1 and 3).

---

**6.** In its notes to Rule 23, the Advisory Committee has explained subdivision (b)(2):

> This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.
> Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration....

Fed.R.Civ.P. 23, Notes of Advisory Committee on Rules to the 1966 Amendment. Although this case does not involve unlawful discrimination against a class, this action does involve past and potential deprivations in violation of the federal constitution and also in violation of § 1983 of the Civil Rights Act.

**7.** These two types of class actions, are permitted if:

the members of the class and need not specify the individual members. Fed. R.Civ.P. 23, Notes of the Advisory Committee to the 1966 Amendments to Rule 23(c)(2).

### C. The County Education Districts

The Texas Education Code provides for the creation of County Education Districts:

(a) Each school district in the state is included in a county education district. A county education district is composed of all school districts that are assigned to a single county in the 1990–1991 Texas School Directory published by the Central Education Agency, except as provide by Subsection (b) of this section.

(b) The school districts that are assigned to a county in each of the following groups of counties in the 1990–1991 Texas School Directory published by the Central Education Agency constitute a county education district: ....

Tex.Educ.Code.Ann. § 20.941 (West Supp. 1992). The Code also states the general authority and purpose of each of the CEDs:

*Each county education district is an independent school district established by* the *consolidation of the local school districts in its boundaries* for the limited purpose of exercising a portion of the taxing power *previously authorized by the voters in those school districts* and of distributing revenue of the county education district to those districts.

*Id.* at § 20.942 (emphasis added). More specifically, the trustees of each County Education District:

*... shall constitute a body corporate* and in the name of the school district *may acquire and hold real and personal property, sue and be sued, and receive bequests and donations or other moneys or funds coming* legally into their hands.

*See id.* at §§ 20.943(c)(1) and 23.26(a). The CEDs are provided with all rights and titles to the personal property of the district. *See id.* at §§ 20.943(c)(3) and 23.26(c). Additionally, each of the CEDs "may enter into contracts and may employ personnel only as necessary for the performance of the duties of the district." *Id.* at § 20.-943(d).

Significantly for Eleventh Amendment issues, the Texas Education Code requires that:

*Each component school district* shall bear the cost of assessing and collecting taxes levied by the county education district, and shall have the legal authority to take actions on behalf of the county education district to ensure the efficient collection of these taxes.

*Id.* at § 20.945. The local school districts, therefore, are responsible for the operating costs of the County Education Districts. The costs and expenses of the CEDs do not come from the state Treasury. Rather, the funding for the CEDs comes entirely from the component school districts within each county education district. Additionally, the revenue collected and distributed by each county education district comes entirely from the taxes collected by the local school districts that are within that particular county education district. The local school districts, individually, are granted the only legal authority to take actions on behalf of the CEDs to collect the taxes levied by the CEDs.

Each of the CEDs is governed by a board of trustees made up of trustees of the component school districts which select their own trustees to serve on the CEDs. *See* Tex.Educ.Code Ann. § 20.943 (West Supp.1992).

The Attorney General has stated:

"County Education Districts are not considered state agencies therefore they are not entitled to representation by the Office of the Attorney General. None of the CEDs have money specifically allocated for legal representation."

*See Motion to Intervene, Motion to Dismiss, Answer and Affirmative Defenses on Behalf of the Texas Attorney General and the Texas Education Agency,* at 2 (filed February 26, 1992).[8] Nevertheless,

---

**8.** This Court notes, however, that eighteen of the C.E.D.'s responded through their own, presumably retained, attorneys. Also almost all of these attorneys were present at this Court's

the Assistant Attorney General did argue that the CEDs are merely arms of the state. The State of Texas does have some control over the CEDs as shown by the discretionary and permissive power of the commissioner of education to adopt rules relating to the operation and administration of the CEDs. *See* Tex.Educ.Code Ann. at § 20.943(e).

The Legislature of the State of Texas has also made known its intent concerning the continued existence of the county education districts:

> It is the intent of the legislature to abolish county education districts if the voters adopt a constitutional amendment authorizing the redistribution among other school districts of taxes levied and collected by a school district.

*Id.* at § 20.948. Implicitly if not explicitly, this legislative enactment shows that the Legislature was aware of the inability of the State of Texas, itself, to redistribute the taxes collected within one school district among other school districts, unless the voters of Texas approve a constitutional amendment that would authorize such a system. This statutory provision also demonstrates the State's awareness that the school districts cannot, without voter approval, perform such a redistribution.[9]

The CED taxes do not ever go into the state treasury. Essentially what happens is that the taxes are collected within each county education district and then the taxes are redistributed to the component local school districts within the county education district.

## III. Eleventh Amendment Issues

### A. *State or Local Governmental Entity*

 A major issue is whether this suit is essentially a suit against the state. Such a suit is generally barred by the 11th Amendment to the Constitution which states that:

The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. 11. Despite its the clear language, the Eleventh Amendment does apply to suits by citizens of a state against their own state. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

In a case involving a school district, the Supreme Court of the United States has stated:

> The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, . . ., but does not extend to counties and similar municipal corporations.

*See Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (citations omitted). The Court explained:

> "The issue turns on whether [the entity being sued] is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend."

*Id.* "The answer depends, at least in part, upon the nature of the entity created by state law." In *Mt. Healthy City School District*, the Court concluded that a local school district was not entitled to assert Eleventh Amendment immunity where the district had extensive powers, including: to issue bonds; to levy taxes within certain restrictions of state law; and where the state law excluded school districts from being part of the "State." *Id.* 429 U.S. at 280–281, 97 S.Ct. at 572–573. The Court held that the school district did not have any such immunity, even though the district both received "a significant amount of money from the State" and was "subject to

---

hearing to determine whether or not this court had jurisdiction over the plaintiffs' alleged causes of action.

**9.** Such a statute could go to the issue of whether or not the State legislature was aware of the potential [state] unconstitutionality of its plan.

some guidance from the State Board of Education." *Id.*

The Fifth Circuit considers the following factors in determining whether an entity is an arm of the state or a local governmental entity:

(1) whether state law views the entity as an arm of the state;

(2) the source of the entity's funding;

(3) the degree of local autonomy retained;

(4) whether the entity is concerned primarily with local, as opposed to state-wide, problems;

(5) whether the entity has authority to sue and be sued in its own name;

(6) whether the entity retains the right to hold and use property.

*See Stem v. Ahearn,* 908 F.2d 1, 4 (5th Cir.1990) (citations omitted) *cert. denied* —— U.S. ——, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991); *see also Minton v. St. Bernard Parish School Board,* 803 F.2d 129, 131 (5th Cir.1986); *see also Farias v. Bexar County Board of Tr. for M.H.M.R. Serv.,* 925 F.2d 866 (5th Cir.1991) *cert. denied* —— U.S. ——, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991). A characterization by a State's courts that a school district or other political subdivision is an "agency of the state" does not amount to an assertion that such entities are "arms of the state" within the meaning of the Eleventh Amendment. *See Minton,* 803 F.2d at 131.

Under the six factors listed above, the 188 county education districts are political subdivisions of the state and are not "arms of the state" with respect to the Eleventh Amendment. The state statutory law clearly views the CEDs as political subdivisions. The Texas Supreme Court views the CEDs as arms of the State. Although most of their acts are mandated by state law, the CEDs are, on the whole, political subdivisions of the state. The funding of each CED comes entirely from the local school districts that compose each CED. All of the taxes collected and distributed by the CEDs come from within their own boundaries. The CEDs receive no money directly from the State. Although the function of the CED is primarily estab-

lished by state law, the CEDs nevertheless must engage in many activities that are within their own discretionary power to do. A concern of the CEDs is statewide in the sense of the overall school funding scheme, but each CED's main concern is local in that all of an individual CED's activities relate to the local school districts within the CED. The CEDs do have the power to sue and be sued in their own name. The CEDs also have the right to hold and use property.

Also, although characterized as "arms" of the State of Texas, the county education districts are no more than a political subdivision of the State of Texas. Indeed, in its *Edgewood III* opinion, the Texas Supreme Court stated that the State Legislature has the "power to create entities like the CEDs ... *as school districts.*" *See Edgewood III,* at 504 (emphasis added). School districts are political subdivisions of the State. The Texas Education Code states that the CEDs: are a "body corporate;" may "sue and be sued;" may "enter into contracts;" and, are run by the board members of the component school districts.

In a similar situation, the Fifth Circuit has held that an institution comparable to a county education district was not an "arm of the state" entitled to protection under the Eleventh Amendment. *See Farias,* 925 F.2d at 875. In *Farias,* the government institution was created by local entities and its trustees were appointed from among the qualified voters of the region. *Id.* Likewise, each CED is composed of its component local school districts and the trustees of each CED are appointed by its component local school districts from their own trustees.

On behalf of the State of Texas, the Attorney General filed a Motion to Intervene to allow the Attorney General of Texas and the Texas Education Agency to intervene in the *Connell Estate* case (92–CA–081). Among other things, the Attorney General argued that the "County Education Districts are not considered state agencies therefore they are not entitled to representation by the Office of the Attorney General." Also, the Attorney General

explicitly states, "None of the CEDs have money specifically allocated for legal representation." On March 11, 1992, the Attorney General filed an Amended Motion to Intervene in this suit. The amended motion contains a copy of the Revised Interlocutory Order of the 250th District Court of the State of Texas which that court entered pursuant to the mandate of the Texas Supreme Court. The state district court stated that for the purposes of the litigation before that court, the members of the CEDs shall be represented by the Attorney General. The CEDs do have funds for legal representation. Representing many of the CEDs, numerous attorneys have appeared before this Court. The Texas Education Code requires that the component local school districts shall reimburse the legal expenses incurred by the CEDs. The Eleventh Amendment in no way prohibits this Court from exercising jurisdiction over the 188 County Education Districts.

Alternatively, if the CEDs are merely "arms of the state," the prospective equitable relief ordered does not interfere with the Eleventh Amendment. The defendants also argue that the main issue in this action concerns only state law. In a 1984 decision, the Supreme Court declared:

> A federal court's grant of relief against state officials *on the basis of state law*, whether prospective or retroactive, does not vindicate the supreme authority of federal law.

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Contrary to the arguments by the defendants, the relief sought from this Court is based upon the federal constitutional rights of the plaintiffs and not upon state law. The five justice majority in *Pennhurst* stated that "suits may not be predicated on the basis of state statutes that command *purely discretionary duties*." *Id.* 465 U.S. at 110, 104 S.Ct. at 913. To the extent injunctive relief is sought, "an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief is effectively against it." *Id.* 465 U.S. at 113,

104 S.Ct. at 915. The *Pennhurst* majority did expressly limit its decision by noting:

> *We do not decide whether the District court would have jurisdiction under this reasoning to grant prospective relief on the basis of federal law, but we note that the scope of any such relief would be constrained by principles of comity and federalism.* "Where as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'"

*Id.* 465 U.S. at 104 n. 13, 104 S.Ct. at 910 n. 13.

The *Pennhurst* majority remanded the case to the circuit court to determine if the district court's judgment could be sustained upon the federal constitutional provisions and law used as an additional or alternative justification for its decision. *Id.* 465 U.S. at 125, 104 S.Ct. at 921. Also, the *Pennhurst* decision involved the exercise of purely discretionary state law duties by state officials at a state hospital, and the state law was not determined to be invalid by the state courts until seven years after the federal suit was filed and four years after the end of the trial of the federal suit. *See generally id.*, 465 U.S. at 107 n. 15, 104 S.Ct. at 911 n. 15. The majority did not want to override the Eleventh Amendment immunity of a state based only on an allegation that official conduct is contrary to a discretionary state statute. *Id.*, 465 U.S. at 106, 104 S.Ct. at 911. For conduct that violates the state's constitution as opposed to a state statute, certainly for such conduct that would consequently violate the United States Constitution, *Pennhurst* is not controlling.

Because this Court finds that the failure of the State of Texas to provide for post-payment relief from the concededly [state] unconstitutional taxes violates the Due Process clauses of the Fifth and Fourteenth Amendments, this Court is not seeking to enforce the state constitution or the state law upon the state. Instead, this Court holds that it does have jurisdiction to

enforce the federal constitutional rights under the Due Process Clause guaranteed to all citizens under the Fifth and Fourteenth Amendments and 42 U.S.C. Section 1983.

■ The question remaining is whether the principles of comity, federalism, and the basic principles concerning equitable relief should preclude this Court from enjoining any action by the State of Texas, its officials, the county education districts, or the local school districts. Unlike *Pennhurst,* the instant case does not involve an issue of whether state officials are conforming their conduct to a purely discretionary state law. The instant case involves a funding scheme that leaves much less discretionary power to the CEDs and the local school districts. The issue to be decided by this Court is whether the continued enforcement of a funding scheme that is concededly unconstitutional under the State's own constitution violates the Due Process clause of the Fifth and Fourteenth Amendments and 42 U.S.C. Section 1983, where the State's own highest court has declared that the State's taxpayers may not use that infirmity as a defense to either avoid paying or seeking refund of the taxes due under the scheme. The rights guaranteed under the Due Process Clause do indeed seem more compelling when a tax system does not merely violate a state statute but, instead, violates the state's own constitution.

The defendants' argument that this Court should not order any postpayment relief of the previously paid taxes also tends to compel this court to reach the conclusion that prepayment relief may be the only available method in which the plaintiff taxpayers would be able to vindicate their rights guaranteed under the United States Constitution and the Civil Rights Act. The defendants argue that any postpayment relief of these taxes paid by means of a refund would cause severe practical problems for the local school districts. The plaintiffs have argued that a postpayment remedy need not be limited to a full refund of taxes paid but could instead use a method of a credit against future taxes.

**B. *Actions Against State Officials***

■ In a recent case, the United States Supreme Court expressly rejected the argument that Eleventh Amendment immunity existed for state officials for their acts under color of state law within the official's authority and necessary to the performance of governmental functions, and the Court held that no such immunity existed for such officials so acting. *See Hafer v. Melo,* — U.S. —, —, 112 S.Ct. 358, 363, 365, 116 L.Ed.2d 301 (1991). The Court reiterated its earlier holding:

> that Congress enacted § 1983 " 'to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.' "

*Id.* (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 243, 94 S.Ct. 1683, 1689, 40 L.Ed.2d 90 (1974)) (quoting *Monroe v. Pape,* 365 U.S. 167, 171–172, 81 S.Ct. 473, 475–476, 5 L.Ed.2d 492 (1961)). The requirement of action "under color of" state law of § 1983 is just as broad as the "state action" requirement of the Fourteenth Amendment. *Id.* (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982)). If the CEDs are not political subdivisions of the State, the board members of the CEDs would clearly be state officials who would be subject to declaratory and injunctive relief.

It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 at n. 14, 103 S.Ct. 2890, 2899 at n. 14, 77 L.Ed.2d 490 (1983) *citing Ex Parte Young,* 209 U.S. 123, 160–162, 28 S.Ct. 441, 454–455, 52 L.Ed. 714 (1908). Federal district courts can clearly prospectively enjoin state officials from engaging in conduct that violates the federal constitution. *See e.g., Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). In an injunctive or declaratory action based upon a federal right, the State's immunity can be over-

come by naming state officials as defendants. *See Kentucky v. Graham,* 473 U.S. 159, 169, n. 18, 105 S.Ct. 3099, 3107, n. 18, 87 L.Ed.2d 114 (1985) *citing Pennhurst* and *Ex Parte Young.* In an action where the Court upheld the district court's injunction against a state official to restrain the official from collecting a state tax, the Supreme Court reiterated the well-recognized rule, under *Ex Parte Young,* that the Eleventh Amendment does not bar a suit to restrain unconstitutional action by a state official. *See Georgia Railroad & Banking Co. v. Redwine,* 342 U.S. 299, 304, 72 S.Ct. 321, 324, 96 L.Ed. 335 (1952).

 Any action by a state official that is purportedly authorized by an [federal] unconstitutional state enactment cannot be taken in an official capacity since the state authorization for such action is a nullity. *See Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). The Texas Supreme Court's decree as to the unavailability of a defense or remedy for taxpayers based upon its decision is in effect tantamount to a state enactment that is void under the federal constitution, and therefore the effective authorization is a nullity. "The State has no power to impart to [a state official] any immunity from responsibility to the supreme authority of the United States." *Ex Parte Young,* 209 U.S. at 160, 28 S.Ct. at 454; *see also Papasan v. Allain,* 478 U.S. at 277, 106 S.Ct. at 2939. The United States Constitution does not distinguish between whether the State's purported grant of immunity came from the State legislature or the State's highest court. The State cannot immunize conduct that violates the United States Constitution.

 As political subdivisions, the county education districts and their trustees may be subject to suit under § 1983 for damages if the actions by those districts in the future represents the State's own policy or custom, whether made by the State's

lawmakers or by others whose edicts may fairly be said to represent official policy. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1985); *see also Kentucky v. Graham,* 473 U.S. at 166, n. 12, 105 S.Ct. at 3105, n. 12. The policy and plans approved by the officials of the Texas Education Agency could subject the county education districts to damages actions for future action that violates the United States Constitution. Local governmental units can be sued directly for damages and injunctive or declaratory relief. *See Kentucky v. Graham,* 473 U.S. at 167, n. 14, 105 S.Ct. at 3106, n. 14. The implementation of state policy may be reached in federal court because actions against state officials in their official capacities for prospective relief do not violate the Eleventh Amendment. *See id.*

## IV. Abstention Issues

The Defendants have raised the issue of abstention as a defense to this Court's exercise of jurisdiction over the subject matter of this case. At the second hearing, various defendants responded that this case does not fall directly under any of the current abstention doctrines but that the court should, nevertheless, abstain. Although the various abstention arguments probably need not be considered by a district court in resolving cases involving state taxes, this Court will, nevertheless, address the reasons for and against abstention.[10] The United States Supreme Court has recognized three main types of abstention, *Pullman, Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Younger.*

### A. *Pullman*

██ In *Pullman,* the Supreme Court declared that "[p]roper exercise of federal jurisdiction requires that controversies in-

---

10. As a, if not the, leading treatise on federal court issues has stated:

"[T]hese state tax cases need not be regarded as abstention cases at all, and may better be considered applications of the statutory policy [28 U.S.C. § 1341, "The Tax Injunction

Act"] against interfering with state taxes where there is a plain, speedy, and efficient remedy in state courts."

17A Charles A. Wright & Arthur A. Miller, *Federal Practice and Procedure* § 4244 (1988).

volving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the underlying constitutional questions." *City of Meridian v. Southern Bell Telephone & Telegraph Co.*, 358 U.S. 639, 640, 79 S.Ct. 455, 456, 3 L.Ed.2d 562 (1959) *citing Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[11] Abstention under *Pullman* is especially proper where the questions of state law are "enmeshed" with federal questions. *Id.*, 358 U.S. at 640, 79 S.Ct. at 456–457.

To abstain under *Pullman*, "a federal court must find that the case presents a difficult, obscure, or unsettled issue of state law, the resolution of which could eliminate or substantially narrow the scope of the federal constitutional issue." *See Nissan Motor Corp. In USA v. Harding*, 739 F.2d 1005, 1008 (5th Cir.1984). "Federal preemption presupposes the availability of an alternative state forum which can afford full and fair relief." *Id.* at 1010. A delay that might significantly impair [federal] constitutional rights weighs against application of the abstention doctrine. *Id.* at 1011. If the state court action does not hold a realistic promise of avoiding the [federal] constitutional issues, "[t]he piecemeal results and delays attendant to abstention should not be imposed on the parties" in the federal action. *Ross v. Houston Independent School District*, 559 F.2d 937, 942 (5th Cir.1977).

In the present action, there are no unsettled questions of state law. The Texas Supreme Court has forcefully and clearly expressed the relevant state law. Also, as the defendants, including the State, have made clear in their arguments opposing any refund of the taxes already paid under this system, the ability of the plaintiff taxpayers to recover [federal] unconstitutionally collected taxes would clearly be significantly, if not totally, impaired once the taxes have already been paid.

**B. *Burford***

The *Burford* abstention may apply when a federal litigant seeks a review in federal court of the reasonableness under state law of a state agency's action. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814–815, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976). Recently, the United States Supreme Court has summarized the principle of abstention known as the *Burford* doctrine:

> *Where timely and adequate state court review is available,* a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar;" or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (emphasis added) *citing to and quoting from Colorado River Water Conservation District*, 424 U.S. at 814, 96 S.Ct. at 1244. As discussed later in this opinion, there is no timely and adequate state court review available to the plaintiffs in this cause. If such a remedy were available, not only should federal courts probably abstain under *Burford* but federal district courts would be unable to exercise either declaratory or injunctive relief in this cause because of the Tax Injunction Act, 28 U.S.C. § 1341.

Similarly to the *New Orleans Public Service* decision, the present action does not involve a state law claim, nor does the action involve the assertion that the federal claims are in any way entangled in a complicated area of state law that must be

---

11. "If there are unsettled questions of state law in a case that may make it unnecessary to decide a federal constitutional question, the federal court should abstain until the state court has resolved the state questions." 17A Wright & Miller, Federal Practice and Procedure, § 4241, at 8 (1988).

resolved before the federal case can proceed. *Id.* (citation omitted). *Burford* does not require abstention where complex state administrative processes are involved or where a potential conflict with state regulatory law or policy may occur. *Id. citing Colorado River Water Conservation District,* 424 U.S. at 815–816, 96 S.Ct. at 1245. There is no doctrine requiring abstention merely because resolution of the federal question may overturn a state policy. *Id. citing to Zablocki v. Redhail,* 434 U.S. 374, 380, n. 5, 98 S.Ct. 673, 678, n. 5, 54 L.Ed.2d 618 (1978).

### C. *Younger*

■■■ The Supreme Court has established a three-part test to determine if the *Younger* abstention is appropriate:

(1) Is there a pending state judicial proceeding?

(2) Does the action implicate important state interests?

(3) Is there an adequate opportunity in the state proceedings to raise [federal] constitutional challenges?

*Middlesex County Ethics Committee v. Garden, Etc.,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). If the constitutional claims of the parties can be determined in the state proceedings and if there is no showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention appropriate, the federal courts should abstain. *Id.,* 457 U.S. at 435, 102 S.Ct. at 2523. "The pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims." *Id.,* 457 U.S. at 432, 102 S.Ct. at 2521. Although the federal courts should not *pre-*

*sume* that the state courts will not safeguard federal constitutional rights,[12] the situation in the present action necessitates a conclusion that the state courts will not guarantee federal rights.

In *Younger,* the Supreme Court stated that any federal claim should be urged as a defense in state court "unless it plainly appears that this course would not afford adequate protection." *Younger v. Harris,* 401 U.S. 37, 45, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). In a recent decision holding that the federal district court should have abstained under *Younger,* the Court reiterated its reluctance "to conclude that Texas courts would have construed procedural rules to deny [the aggrieved party] an effective opportunity to raise its [federal] constitutional claims." *See Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 16, 107 S.Ct. 1519, 1528, 95 L.Ed.2d 1 (1987). The Court explained:

> [W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, *in the absence of unambiguous authority to the contrary.*

*Id.,* 481 U.S. at 15, 107 S.Ct. at 1528 (emphasis added). In *Pennzoil,* the Court recognized several reasons supporting a *Younger* abstention: (1) the basic doctrine that a court should not exercise its equitable powers when the moving party has an adequate remedy at law; (2) the comity between the States and National Government that weighs against the exercise of federal judicial power when the State's interests in the proceeding are so important;[13] (3) the avoidance of unwarranted determinations of federal constitutional

---

**12.** *See id.,* 457 U.S. at 431, 102 S.Ct. at 2521 (emphasis in original).

**13.** The Court quoted the following passage from *Younger:*

"This underlying reason ... is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, ... the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.... This concept does not mean blind deference to "States'

Rights".... What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."

*Pennzoil,* 481 U.S. at 10, 107 S.Ct. at 1525–1526, *quoting from Younger v. Harris,* 401 U.S. at 44, 91 S.Ct. at 750.

questions. *Id.*, 401 U.S. at 10–12, 107 S.Ct. at 1525–1526. Abstention under *Younger* is mandated if state proceedings are pending and if the state courts have the ability to resolve the federal questions. *Id.*, 401 U.S. at 14, 107 S.Ct. at 1527.

Although a [federal] constitutional attack, by itself, on state procedures does not automatically vitiate the adequacy of state procedures under *Younger*,[14] such an attack coupled with a total inability to obtain any substantive review by the State courts would preclude the application of an abstention under *Younger*. Indeed, the United States Supreme Court has recently reiterated:

> There is no greater federal interest in enforcing the supremacy of federal statutes than in enforcing the supremacy of explicit [federal] constitutional guarantees, and [federal] constitutional challenges to state action, no less than preemption based challenges call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action.

*New Orleans Public Service*, 491 U.S. at 364, 109 S.Ct. at 2516. Although the federal court's disposition of a case such as the present action may affect or pre-empt a future or pending state judicial proceeding, no doctrine excludes the federal courts merely because of the availability or pendency of state judicial proceedings. *See id.*, 491 U.S. at 371, 109 S.Ct. at 2520.

In the present action, no state court proceeding is pending for most of the plaintiff class. Even if such a proceeding could be said to be pending, the only unsettled issues are federal not state, and the plaintiff class does not have an adequate remedy under state law.

If, on review, a determination is made that a state action is pending, equitable relief is still warranted. Since actions under 42 U.S.C. § 1983 are an express statutory exception to 28 U.S.C. § 2283, the Anti–Injunction Act does not apply to this § 1983 action. *See Mitchum v. Foster*, 407 U.S. 225, 242–243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972); *see also Trainor v. Hernandez*, 431 U.S. 434, 444, n. 8, 97 S.Ct. 1911, 1918, n. 8, 52 L.Ed.2d 486 (1977). Actions under 42 U.S.C. § 1983 fall within the "expressly authorized" exceptions to the Anti–Injunction Act, 28 U.S.C. § 2283. *Id.* Indeed,:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under the color of state law, "whether that action be executive, legislative, or judicial." In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a "suit in equity" as one of the means of redress. And this Court long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights.

*Id.* (citations omitted).

To determination of whether *Younger* or *Huffman* should apply based upon an assertion that the aggrieved parties could not present their federal due process challenge in the state courts, the United States Supreme Court has permitted the federal district courts to rule on such an issue. *See Trainor v. Hernandez*, 431 U.S. at 447 and n. 10, 97 S.Ct. at 1920 and n. 10. These parties have shown that no such challenge can be adequately presented in state courts. To require that the taxpayers assert such a challenge which is futile in the state courts would likely result in the taxpayers irreparable loss of a federal constitutional right. Along with the extraordinary circumstances of this case, the fact that the collection of a clearly unlawful tax is patently and flagrantly violative of express constitutional provisions precludes abstention and warrants equitable relief.

---

**14.** *See Ohio Civil Rights Commission v. Dayton Christian Schools,* 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986). The Court did state that there was no reason to doubt that the aggrieved party would receive an adequate opportunity to raise its [federal] constitutional claims. *Id.*

*See id.*, 431 U.S. at 446–447, 97 S.Ct. at 1919 (citations omitted). The plaintiffs in this case cannot obtain a full hearing and judicial determination in the state courts on their federal constitutional challenge.

## V. Res Judicata and Collateral Estoppel

█] Generally, "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Martin v. Wilks*, 490 U.S. 755, 762, 109 S.Ct. 2180, 2185, 104 L.Ed.2d 835 (1989) (footnote omitted). Exceptions may exist where a non-party has his or her interests adequately represented by a party with similar interests in a class action. *Id.* at n. 2.

Writing for a unanimous United States Supreme Court, Justice Marshall explained the basic principles of collateral estoppel in the federal court system:

> ... Title 28 U.S.C. § 1738 generally requires "federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S., [90] at 96, 101 S.Ct., [411] at 415 [66 L.Ed.2d 308 (1980) ]. In federal actions, including § 1983 actions, a state-court judgment will not be given collateral-estoppel effect, however, where "the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Id.*, at 101, 101 S.Ct., at 418. Moreover, additional exceptions to collateral estoppel may be warranted in § 1983 actions in light of the "understanding of § 1983" that "the federal courts could step in where the state courts were unable or unwilling to protect federal rights." *Ibid.* Cf. *id.*, at 95, n. 7, 101 S.Ct., at 415, n. 7; *Board of Regents v. Tomanio*, 446 U.S. 478, 485–486, 100 S.Ct. 1790, 1795–1796, 64 L.Ed.2d 440 (1980) (42 U.S.C. § 1988 authorizes federal courts, in an action under § 1983, to disregard an otherwise applicable state rule of law if the state law is inconsistent with the federal policy underlying § 1983).

*Haring v. Prosise*, 462 U.S. 306, 313–314, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983) (footnotes omitted).

No proof has been offered that the class representatives, or others with the *same* interests, in the present action were before the Texas Supreme Court. Also, no evidence has been offered to show that these persons were adequately represented by someone with the same interests. Although some of the unnamed members of this class may well have been before the Texas Supreme Court, the number of those is minimal compared to the class in this action. Additionally, the issues and arguments before that court were of a different nature and focus than the main issue before this court.

## VI. 28 U.S.C. § 1341: Injunctions and Taxes by States

█ Section 1341 of Title 28 of the United States Codes prohibits, in most instances, district courts from enjoining the collection of any taxes under state law:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection or any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341. This statute also applies with equivalent force to declaratory judgment actions concerning state taxes. *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407 (1943). In the present action seeking both declaratory and injunctive relief, the primary issue is whether "a plain, speedy and efficient remedy may be had in the courts of such State."

As the State correctly argues, *McKesson* involved a tax that was held unconstitutional under the Commerce Clause of the United States Constitution. Consequently, the state proceeds to argue that *McKesson* should not be held to apply to state tax schemes that only violate state law. A distinction should be recognized, but perhaps a distinction should also be recognized between tax schemes that merely violate a

state or local statute and tax schemes that violate a state's constitution. The basic issue is whether the State provides a remedy. The issue in the present action is the State's continued enforcement of a tax scheme that has been found unconstitutional under the State constitution. Such a continued enforcement would violate the Fifth and Fourteenth Amendments of the United States Constitution.

The State relies heavily on the Supreme Court's decision rendered on the same day as *McKesson*. In that decision the Court reiterated its conclusion that:

> When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions.

*American Trucking Associations, Inc. v. Smith*, 496 U.S. 167, 177, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990) (citations omitted). Later in its opinion, the Court clarified the issues of retroactivity and prospectivity:

> It is, of course, a fundamental tenet of our retroactivity doctrine that the prospective application of a new principle of law begins on the date of the decision announcing the principle.

*Id.*, 496 U.S. at 187, 110 S.Ct. at 2335. In the civil context, the retroactivity of decisions continues to be governed by the *Chevron Oil* standard. *Id.*, 496 U.S. at 179, 110 S.Ct. at 2331. The critical event for prospectivity is the occurrence of the underlying transaction, and not the payment of money therefor. *Id.* 496 U.S. at 187, 110 S.Ct. at 2336 (discussing a use tax) (citations omitted).

In the state case underlying *American Trucking*, the Arkansas Supreme Court did hold that the state tax was unlawful, in light of an earlier decision of that court, but that court went on to hold that there would be no refunds of taxes paid before the date of the order issued by Justice Blackmun requiring the state to escrow all future taxes paid under the scheme (because of the likelihood that the tax at issue would be found unconstitutional by the Supreme Court if the Arkansas Supreme Court did not so find). *Id.* 496 U.S. at 174

and 175, 110 S.Ct. at 2328 and 2329. In his capacity as Circuit Justice, Justice Blackmun concluded that, "because there is a substantial risk that [petitioners] will not be able to obtain a refund if the [tax] ultimately is declared unconstitutional," petitioners would suffer "irreparable injury absent injunctive relief." *Id.* 496 U.S. at 174, 110 S.Ct. at 2328. In *American Trucking*, the Court explained that:

> ... *McKesson* indicates that federal law sets certain minimum requirements that States must meet but may exceed in providing appropriate relief.

*American Trucking*, 496 U.S. at 178–179, 110 S.Ct. at 2331. The Supreme Court concluded that it was not in a position to determine the relief to petitioners for their 1987–1988 tax payments, so the Court remanded that issue to the Arkansas Supreme Court to let it determine the appropriate relief in light of the Court's decision in *McKesson*. *Id.* 496 U.S. at 200, 110 S.Ct. at 2343.

In *American Trucking*, the Court noted that the due date of the taxes was not the decisive issue as to whether the taxes were legally collected. *See id.*, 496 U.S. at 187, 110 S.Ct. at 2336. Instead, the "critical event" for prospectivity depends upon the occurrence of the underlying transaction, and not the payment of money therefor. *See id.* Although *American Trucking* involved highway use taxes, the same rationale can be applied in the present action. Although the *Edgewood III* opinion was issued one day before the due date of property taxes for the 1991 year, the taxes due on January 31, 1992, were for the use and enjoyment of the property for the 1991 year. Similarly, the taxes that would have been due on January 31, 1993, would have been for the use and enjoyment of the property for the 1992 year. Accordingly, because the system was not declared to be unlawful until one month after the 1991 year, the taxes due on January 31, 1992, are not refundable due to the unlawfulness of the tax scheme. The scheme was not declared unlawful until after the taxpayers had used and enjoyed their property for those taxes.

■■■ This statute, "The Tax Injunction Act," applies to declaratory as well as injunctive relief. *See Franchise Tax Board of California v. Alcan Aluminum Limited*, 493 U.S. 331, 338, 110 S.Ct. 661, 666, 107 L.Ed.2d 696 (1990). This provision was "first and foremost a vehicle to drastically limit federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Id.* (quoting from *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 522, 101 S.Ct. 1221, 1233, 67 L.Ed.2d 464 (1981)).

"A federal district court is under an equitable duty to refrain from interfering with a State's collection of its revenue *except in cases where an asserted federal right might otherwise be lost.*" *Tully v. Griffin*, 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976) (emphasis added). The basic inquiry for a district court is whether under the State's law there is a "plain, speedy, and efficient" means by which taxpayers *can assert constitutional claims* while preserving the right to challenge the amount of the tax due. *Id.*, 429 U.S. at 74, 97 S.Ct. at 219 (emphasis added). The Supreme Court has held that "uncertainty concerning a State's remedy may make it less that 'plain' under 28 U.S.C. § 1341." *Id.*, 429 U.S. at 76, 97 S.Ct. at 224. In *Tully*, the Supreme Court found no reason to believe that a State court would question its ability to award preliminary relief. *Id.* The State courts had awarded preliminary relief in declaratory judgment actions concerning state taxes. *Id.* The Court stated that the State's own precedents convincingly demonstrated the lack of support for the aggrieved party's concerns about the availability of relief under state law. *Id.* Likewise, in *Rosewell*, the Supreme Court stated that there was no question that the state courts would hear and decide any federal claim. *See Rosewell v. LaSalle National Bank*, 450 U.S. at 517, 101 S.Ct. at 1231.

Under the recent decision of the Texas Supreme Court, there is no state remedy based upon the state unconstitutionality of the taxes in the CEDs system, or at best the remedy is highly uncertain and definitely not "speedy, plain, and efficient."

The Texas Supreme Court has expressly stated that its own "ruling is not to be used as a defense to the payments of any such taxes." *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 522 (1992). The Texas Supreme Court expressly recognized that its decision would "allow the collection of a tax without voter approval, in derogation" and in violation of two provisions of the Texas Constitution. *See id.* at 520. Although the Texas Supreme Court entered its decision on January 30th of 1992, that court stayed the effect of its decision invalidating the current school finance system until June 1, 1993, over 17 months after the date of its decision. *See id.* at 522. The Texas Supreme Court did not specifically limit its ruling that the unconstitutionality of the tax scheme under state law cannot be used as a defense to the payment of taxes under the scheme.

With respect to the CEDs in the present situation, the taxes themselves do not appear to be in violation of the United States Constitution. The issue is more appropriately whether the continued collection of taxes under a scheme that is and has clearly been held to be unconstitutional under the State constitution violates the United States Constitution or any other federal laws. This dispute clearly presents a federal question. Under the Tax Injunction Act, however, a federal district court cannot enjoin the collection, levy, or assessment of state taxes if a "plain, speedy, and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.

VII. The Availability of a State Remedy

In its opinion delivered on January 30, 1992, the Texas Supreme Court expressly held that Senate Bill 351, creating the county education district tax scheme, violates two sections of the Texas Constitution:

First, we hold that Senate Bill 351 levies a state ad valorem tax in violation of article VIII, section 1–e; and second, we hold that the Bill levies an ad valorem tax without an election in violation of

article VII, section 3 of the Texas Constitution.

*Edgewood III,* at 493. Despite its so holding, the Texas Supreme Court expressly stated, *"Our ruling is not to be used as a defense to the payment of such taxes." Id.* at 522.

At the hearing held before this Court on March 13, 1992, an attorney for the Travis County Education District argued that the Texas Supreme Court has not yet declared that the school finance system created by Senate Bill 351 is unconstitutional because that court's self-imposed delayed effect of its decision does not make the finance system unconstitutional until July 1, 1993. The Assistant Attorney General of Texas also made this same argument at the hearing. This Court finds such arguments lack merit. Having already repeated its various holdings of unconstitutionality of the system numerous times throughout its opinion, the Texas Supreme Court stated, "Having concluded that provisions of Senate Bill 351 violate the Constitution, we now turn to the effect of our ruling." The Texas Supreme Court did find and did hold that the school finance system at issue was and is unconstitutional. This Court concurs and follows the construction of the state's own laws by the highest state court. This Court is not overruling or changing any of the holdings of the Texas Supreme Court in *Edgewood III.* This Court's decision is, however, based upon the effect of the *Edgewood III* decision as to the adequacy and availability of a state remedy for the plaintiff taxpayers.

■ Because of the Texas Supreme Court's decision as to the effect of its declaring the school finance system unconstitutional, the doctrine of *stare decisis* mandates that the lower state courts and administrative tribunals adhere to the ruling of the State's highest court. Indeed, discussing its role in the state system, a Texas Court of Appeals has explained, "As an intermediate court, we are duty-bound to follow the Texas Supreme Court's expressions of the law and to leave changes in the application of common law rules to that higher authority." *Winograd v. Willis,*

789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (declining to recognize an implied covenant where neither the state's highest court or the state legislature had yet recognized one). Another Texas Court of Appeals has elaborated upon this principle:

This [intermediate state appellate court] *must recognize and apply* the Texas Supreme Court's deliberate statement of the law *and,* by exercising judicial self-restraint, *refrain from extending or restricting the scope of the [Texas] supreme court's declaration.*

*Lumpkin v. H & C Communications, Inc.,* 755 S.W.2d 538, 540 (Tex.App.—Houston [1st Dist.] 1988, writ denied) (emphasis added). "[O]nce the [Texas Supreme] Court decides upon a rule of law, the decision is, in the absence of a controlling decision by the United States Supreme Court, binding on the lower courts [of the state], until the [Texas Supreme] Court changes the rule." *Daves v. State Bar of Texas,* 691 S.W.2d 784, 789 (Tex.App.—Amarillo 1985, writ refused n.r.e) *appeal dismissed* 474 U.S. 1043, 106 S.Ct. 774, 88 L.Ed.2d 754 (1986) (for want of a substantial federal question). The Texas Supreme Court need not defend its opinions from the criticism of the courts of appeals, and the courts of appeals must follow the pronouncements of the Texas Supreme Court. *See Lofton v. Texas Brine Co.,* 777 S.W.2d 384, 386 (Tex.1989).

■ The Texas Supreme Court is free to amend one of its own judicially created doctrines. *See Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985) (creating an exception to the employment at will doctrine as established in an 1888 decision of the Texas Supreme Court). Taxpayers should not be forced to undergo the merely pro forma steps of litigating in the state courts to attempt to obtain an overruling of an issue that has been so recently decided by the state's highest court.

The Texas Supreme Court's clear declaration in *Edgewood III,* is in some aspects comparable to an enactment by the Texas Legislature of a statutory provision that

prohibits any taxpayer from asserting as a defense to payment that the tax system is unconstitutional under the state constitution. A significant difference between a ruling by the state's highest court and a comparable enactment by the state legislature is that the legislative enactment would be subject to judicial review in the state's own courts. A decision by the highest state of the court, however, is binding upon all of the lower state courts and administrative officials.

■■■ A remedy that is uncertain or speculative is not adequate to bar a federal district court's jurisdiction. *Franchise Tax Board*, 493 U.S. at 340, 110 S.Ct. at 667. In *Alcan Aluminum*, the Court stated that it could not "hold the Act [28 U.S.C. § 1341] inapplicable on the *mere speculation* that the [State] courts will not allow the [taxpayers] to raise arguments going to the constitutionality of the taxes they are required to pay." *Id.* (emphasis added). In the present action, the plaintiffs have demonstrated that their state remedy is not only uncertain but also unavailable. The plaintiffs have convincingly shown that the State courts will not entertain the federal due process arguments of the class. *See id.*

The United States Supreme Court has reversed the decision of the highest state court of West Virginia regarding the assessment of ad valorem taxes on taxpayers who alleged that the assessment violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See generally Allegheny Pittsburgh Coal Co. v. County Commission of Webster County*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). The United States Supreme Court had granted certiorari to review the decision of the West Virginia Supreme Court of Appeals involving a direct challenge by landowners to the valuation placed on their real property by the county assessor:

> We granted certiorari to decide whether these Webster County tax assessments denied petitioners the equal protection of law, and, if so, whether petitioners could constitutionally be limited

to the remedy of seeking to raise the assessments of others.

*Id.* 488 U.S. at 342, 109 S.Ct. at 637. The petitioner taxpayers argued that the valuation method violated the Fourteenth Amendment's guarantee of equal protection. *Id.* The United States Supreme Court agreed. *Id.* 488 U.S. at 342, 109 S.Ct. at 637. The Court interpreted the decision of the West Virginia Supreme Court of Appeals as holding that:

> ... even if there is a constitutional violation on these facts, the only remedy available to petitioners was an effort to have the assessments on the neighboring properties raised by an appropriate amount.

*Id.* After holding that the assessments violated the Fourteenth Amendment, the United States Supreme Court proceeded to hold that the remedy specified by the West Virginia court was inadequate. *Id.* The Court rested its decision on the fact that:

> "The [Equal Protection Clause] is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class."

*Id.* 488 U.S. at 346, 109 S.Ct. at 639. In the case before this Court, the Texas Supreme Court has not merely given the taxpayers of Texas a limited remedy under state law. Instead, the Texas Supreme Court has effectively eliminated any possible state remedy for these taxpayers.

In *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County*, the aggrieved taxpayers had requested review of a decision of their state's highest court by the United States Supreme Court. The Defendants in this case have made the argument that the plaintiff taxpayers do not belong in a United States District Court but that the taxpayers should have appealed to the United States Supreme Court. This argument has no apparent basis in the principles of justice and equity.

In another decision, the United States Supreme Court held that a federal district court had jurisdiction over a tax dispute

case because of the uncertainty surrounding the adequacy of the State remedy. *See Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 105–106, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944) [15]. The Court did state, however, that the federal district court should abstain, under the *Pullman* doctrine, from proceeding with the action until the state law is determined by the state courts. *See id.,* 323 U.S. at 106 and 104, 65 S.Ct. at 155 and 154. In *Spector,* the highest State court had not yet considered or construed, under state law, the disputed state tax. *Id.,* 323 U.S. at 104, 65 S.Ct. at 154.

In a decision rendered after *Spector,* the United States Supreme Court concluded that much uncertainty surrounding the adequacy of the state remedy justified the federal district court's exercise of jurisdiction. *See Hillsborough Township v. Cromwell,* 326 U.S. 620, 626, 66 S.Ct. 445, 449, 90 L.Ed. 358 (1946). The Court concluded that the past decisions of the State courts only permitted the taxpayers aggrieved because of allegedly unfairly assessed taxes to seek increases in the taxes of other members of their class. *See id.,* 326 U.S. at 624, 66 S.Ct. at 448. On the basis of such a limitation, the Supreme Court stated that "it is plain that the state remedy is not adequate to protect [the taxpayers'] rights under the federal Constitution. *Id.* More recently, the United States Supreme Court has reiterated that it "has not hesitated to declare a state refund provision inadequate to bar federal relief if the taxpayer's opportunity to raise his constitutional claims in the state proceedings is uncertain." *See California v. Grace Brethren Church,* 457 U.S. 393, 414, n. 31, 102 S.Ct. 2498, 2511, n. 31, 73 L.Ed.2d 93 (1982). Such taxpayers may seek relief in federal district court. *Id.* In the present action, the Texas Supreme Court has not just limited the available relief, as the state courts had done in *Hillsborough,* but the highest Texas court has effectively extinguished any possible state remedy. Also,

contrary to the statement of the Supreme Court in *California v. Grace Brethren Church,* there is every reason to doubt that the appropriate agencies will respect the Texas Supreme Court's conclusion that the tax scheme is unlawful. *See California v. Grace Brethren,* 457 U.S. at 414, 102 S.Ct. at 2511.

The Sixth Circuit addressed a similar situation that required a resolution of whether the taxpayers had a plain, speedy and efficient remedy under State law, in light of a decision of that State's highest court rendered some seventy years previously. *See Louisville & Nashville Railroad Co. v. Public Service Commission,* 631 F.2d 426, 428 (6th Cir.1980) *cert. denied* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 384 (1981). Despite the arguments by the State that the old decision of the State's highest court was no longer a limitation on taxpayers' remedies, the Sixth Circuit found that the State court's ruling was still in full effect in the State. *See id.* at 430 and 432. Finding that 28 U.S.C. § 1341 did not bar the federal district court from exercising its powers, the Sixth Circuit affirmed the holding of the district court that the discriminatory assessment of taxes denied equal protection under the Fourteenth Amendment. *See id.* at 432. Consequently, the court also upheld the federal district court's injunction against the collection of the ad valorem taxes against the aggrieved taxpayers. *Id.* In the present action, no parties have ventured to assert that the Texas Supreme Court's declaration in *Edgewood III* is no longer the law in the State. Clearly, the *Edgewood III* decision establishes the rule of law in the State of Texas.

In a case with analogous procedural facts to the present action, the United States Supreme Court held that the Tax Injunction Act, 28 U.S.C. § 1341, did not bar a federal district court from enjoining a state ad valorem tax because the taxpayers did not have a "plain, speedy, and efficient" remedy in the state courts. *See*

---

**15.** The United States Supreme Court has rejected the *"Spector* rule," that a state tax on the "privilege of doing business" is *per se* unconstitutional when it is applied to interstate commerce. *See Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 288–289, 97 S.Ct. 1076, 1084, 51 L.Ed.2d 326 (1977) (overruling only that part of the *Spector* decision).

*Georgia Railroad & Banking Co. v. Redwine,* 342 U.S. 299, 302–303, 72 S.Ct. 321, 323–324, 96 L.Ed. 335 (1952). The Supreme Court noted that: (1) the injunctive remedy in state court had been tried unsuccessfully; (2) arresting the tax collection by affidavits of illegality in state courts requiring the filing of numerous claims in numerous different counties to protect the single claim was not an adequate state remedy; and, (3) a refund suit in state courts was also not adequate. *See id.*

The Supreme Court has also recognized that federal-court jurisdiction in similar tax cases is proper when the taxpayers' state court remedy would result in a multiplicity of suits. *Rosewell v. LaSalle National Bank,* 450 U.S. at 518, 101 S.Ct. at 1231.[16] The Court declined to declare that a state remedy is inefficient where the State's remedy imposed "no unusual hardship on respondent requiring ineffectual activity or an unnecessary expenditure of time or energy." *Id.,* 450 U.S. at 518, 101 S.Ct. at 1231. In *Rosewell,* the Court emphasized that the exception provision of the Tax–Injunction Act required the state-court remedy must meet certain minimal *procedural* criteria. *Id.,* 450 U.S. at 512, 101 S.Ct. at 1228 (emphasis in original). Federal courts must make and have made distinctions between state procedures that are uncertain, merely speculative, or unavailing. In another dispute over the issue of an adequate remedy at law concerning allegedly illegal taxes, the Supreme Court declared that:

> Resort may be had to equity in order to avoid the multiplicity of suits necessarily involved in the procedure prescribed for recovery of illegal [tax] exactions.

*See Graves v. Texas Co.,* 298 U.S. 393, 403, 56 S.Ct. 818, 823, 80 L.Ed. 1236 (1936).

In the present action, injunctive relief is clearly not available in the state courts. The other avenues of state relief are foreclosed by the *Edgewood III* ruling. For taxpayers who own multiple pieces of property, such taxpayers would have to file numerous protests in numerous counties that would all assert the same federal claim. The same would be true for such taxpayers in refund suits, which could also be barred by the Texas "voluntary payment" rule. For all practical purposes, the exact scheme by which these taxes are collected and distributed compels against the likelihood of any post-payment relief. The defendants' argument that post-payment refunds, even if possible, would be devastating to the public school districts. Such an argument does weigh against any remedy for the taxes already paid under this scheme, but the same argument weighs against forcing the plaintiffs to pursue a fruitless action in state court. Enforcement of this tax scheme could easily result in irreparable injury to the taxpayers. Additionally, to require that these taxpayers commence actions in state court would impose an undue hardship upon the taxpayers requiring ineffectual expenditures of time and energy.

Actual doubt concerning the recoverability of paid taxes both eliminates the statutory prohibition against enjoining state tax collections and such doubt is also a basis for apprehension of genuine and irretrievable loss. *See Denton v. City of Carrollton, Georgia,* 235 F.2d 481, 485 (5th Cir. 1956) (citations omitted). In the present action, the plaintiffs have demonstrated actual doubt and, further, they have shown certainty as to the nonrecoverability of these taxes in the state courts. These taxpayers would be irreparably harmed if this tax scheme is allowed to continue. For the reasons discussed below, the State of Texas can and does have the time and the ability to solve the State's own problem of school financing.

Addressing the use of § 1983 actions in federal courts, the Supreme Court has stated:

> ... [I]n *Monroe v. Pape,* [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)], the Court inferred that Congress had intend-

---

**16.** The *Rosewell* Court did note that repetitive suits on the same issue may not be efficient within the meaning of the term as used in the Tax Injunction Act. *Rosewell,* 450 U.S. at 518 n. 22, 101 S.Ct. at 1231, n. 22.

ed a federal remedy in three circumstances: where state substantive law was facially unconstitutional, *where state procedural law was inadequate to allow full litigation of a constitutional claim, where state procedural law, though adequate in theory, was inadequate in practice.* 365 U.S., at 173–174, 81 S.Ct., at 476–477. In short, the federal courts could step in where the state courts were unable or unwilling to protect federal rights. *Id.,* at 176, 81 S.Ct., at 478.

*Allen v. McCurry,* 449 U.S. 90, 100–101, 101 S.Ct. 411, 418, 66 L.Ed.2d 308 (1980) (emphasis added). The interpretation of § 1983 in *Monroe* does not su₁port any argument that Congress intended to allow relitigation of federal issues decided after a full and fair hearing in a state court merely because of a possible error in the state court's decision. *Id.,* 449 U.S. at 101, 101 S.Ct. at 411. In *Allen v. McCurry,* the Court reversed the Eighth Circuit's reversal of a federal district court's decision holding that a criminal defendant is collaterally estopped from relitigating, as a § 1983 claim in federal court, an issue already decided in state court where the defendant had a full and fair opportunity to litigate the federal claims. *Id.,* 449 U.S. at 104–105, 101 S.Ct. at 420. Presumably, the defendant in *Allen* should have appealed the state court decision to the United States Supreme Court.

In a case involving whether the Tax Injunction Act barred § 1983 suits for damages, the Supreme Court has held "that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts." *See Fair Assessment in Real Estate Ass'n v. McNary,* 454 U.S. 100, 116, 102 S.Ct. 177, 186, 70 L.Ed.2d 271 (1981).

> [T]axpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts. Such taxpayers are required to seek protection of their federal rights by state remedies, *provided of course that those remedies are plain, adequate, and complete,* and may ulti-

mately seek review of the state decisions in this Court.

*Id.* (footnotes and citations omitted) (emphasis added). The Supreme Court qualified its comity decision to permit taxpayers to seek protection of their federal rights in federal court when the state remedies are not "plain, adequate, and complete." *See id.* "The recovery of damages under the Civil Rights Act first requires a "declaration" or determination of the unconstitutionality of a state tax scheme that would halt its operation." *Id.* 454 U.S. at 115, 102 S.Ct. at 186. In *McNary* the District Court found that the taxpayers had the means to justify the allegedly unjust situation through the state's own processes. *Id.* Additionally, the Supreme Court noted that the adequacy of the State's remedy was not at issue in the case and that the particular State's own state supreme court had held that the taxpayers could assert such claims in state court. *Id.*

In the present action, the Texas Supreme Court's *Edgewood III* decision denies the taxpayers the ability to assert, or at least the possibility to prevail upon, such claims in state court with respect to the county education district tax system. Consequently, *McNary* does not preclude the federal district court from exercising its jurisdiction in this § 1983 action.

In its past decisions, the Supreme Court has held "that the illegality or unconstitutionality of a state or municipal tax would not *in itself* provide the foundation for equitable relief in the federal courts." *See Fair Assessment in Real Estate Ass'n v. McNary,* 454 U.S. 100, 127, 102 S.Ct. 177, 191, 70 L.Ed.2d 271 (1981) (Brennan, concurring along with three other justices) (citations omitted) (emphasis added). Discussing the history of such disputes, the Court went on to state that:

> [T]he federal courts would not enjoin the collection of state taxes, despite the possible unconstitutionality of the exaction, *where there existed a "plain, adequate and complete remedy at law."*

*Id.,* 454 U.S. at 127, 102 S.Ct. at 192.

The adequacy of the State remedy was not at issue in *McNary. See id.* Because

the State remedy is not adequate for the taxpayers in this action, the principles of comity which barred the § 1983 action in *McNary* do not bar this action.

The plaintiff class did not have a full or fair opportunity to litigate their federal claims in state court. The state procedural law, perhaps not even adequate in theory, is clearly not adequate in practice in this situation.

As far as the actual tax system at issue in this case, the State of Texas does provide certain procedures to contest the assessment and levy of certain taxes. Because these various procedures would not afford any remedy to the plaintiff taxpayers, this Court does not decide whether the exact procedures themselves would comply with due process concerns in an abstract sense. The possible procedures to contest taxes are as follows.

The Texas Property Tax Code provides the procedures by which a taxpayer may protest the imposition of *local* property taxes. *See generally*, Tex.Tax Code § 41.41 *et seq.* (Vernon's Supp.1992) (emphasis added). Specifically, a property owner is entitled to protest before the appraisal review board: ... "(9) any other action of the chief appraiser, appraisal district, or appraisal review board that applies to and adversely affects the property owner." *See id.* at § 41.41.[17] The Texas courts have held that the remedies under this part of the Texas Tax Code are a property owner's exclusive remedies when the property owner is unsatisfied with the appraisal or any other aspect of ad valorem property tax falling within grounds of protest allowed under Section 41.41 of the Tax Code, which specifies the grounds for protest. *See e.g., Valero Transmission Co. v. Hays Consol. Independent School Dist.,* 704 S.W.2d 857, 861–862 (Tex.App.—Austin 1985, writ refused n.r.e.).

This title of the Texas Tax Code specifically states that its procedures for protest are exclusive and that a taxpayer cannot raise any of the grounds of protest permitted under this title as a defense: (1) to a suit to enforce collection of delinquent taxes; *or*, (2) as a basis to enjoin the tax collection process or obtain a refund of taxes paid. § 42.09(a).

The Texas Supreme Court has held: "If [a taxpayer] fails to comply with the administrative procedure of protest, [the taxpayer] is precluded from raising non-ownership in defense to a suit to enforce collection of delinquent taxes." *Robstown Independent School District v. Anderson,* 706 S.W.2d 952, 952–953 (Tex.1986). Any assessment of taxes must be protested before the appraisal review board or the defense of non-ownership is waived. *Id.* If a taxpayer cannot raise non-ownership as a defense, then presumably such a taxpayer would be precluded from asserting any other right protected under the federal constitution.

Under the "voluntary payment rule" in Texas, a taxpayer who voluntarily pays an illegal tax has no valid claim for repayment of the tax, except in cases of fraud, implied or express duress, or mutual mistake. *Houston Lighting & Power Co. v. Dickinson School District,* 794 S.W.2d 402, 405 (Tex.App.—Texarkana 1990, writ denied) *citing State v. Connecticut General Life Insurance Co.,* 382 S.W.2d 745, 746–747 (Tex.1964).

This voluntary payment doctrine would preclude any taxpayer who has paid his or her taxes under the current school tax system from raising the unconstitutionality of the system as a defense in a delinquency suit.

If a taxpayer decided to not pay such taxes and then try to raise the unconstitutionality as a defense to payment, the Texas courts may well find that the taxpayer is precluded, pursuant to Section 42.09 of the Tax Code, from raising such a defense. Even if a Texas court were to permit taxpayers to raise such a defense, the Texas courts would be bound to follow the hold-

---

**17.** This Court does find it questionable whether a taxpayer can assert a state constitutional challenge to a property tax scheme by means of a protest to an appraisal review board. Indeed, the Texas Tax Code provisions, and even the name of the board itself, suggest that the board's function is to resolve *valuation* problems concerning the appraised value of properties.

ing of the Texas Supreme Court that taxpayers may not use the unconstitutionality of the tax system as a defense to the obligation to pay the taxes.

When a taxpayer loses a delinquency suit, not only would the taxpayer have likely expended extensive funds to defend the action, but the losing taxpayer would be subject to numerous other fines and expenses under state law.

If a person were to raise these issues in a state court proceeding, the state courts or their appointed arbiters would most likely have the problem of deciding whether to impose sanctions upon any attorney or party who raised these federal issues as a reason to either not pay these taxes or to obtain a refund.

In Texas the state courts have broad powers to sanction the attorney and the client for the filing of frivolous pleadings or motions. Comparable to Rule 11 of the Federal Rules of Civil Procedure, Rule 13 of the Texas Rules of Civil Procedure states that the court must impose appropriate sanctions against the attorney and the client who violate this rule.[18] In addition, the Texas courts of appeals has discretionary power, in civil cases, to award damages to the appellee when "an appellant has taken an appeal for delay and without sufficient cause." *See* Tex.R.App.Proc. 84. Although a sanction for making this legitimate claim in state court would be unwarranted, a state court might believe otherwise.

Other potential alternatives exist for the taxpayers to attempt to challenge this tax system. The Fifth Circuit has expressly recognized that these various alternatives do create an adequate State remedy in certain taxpayer disputes. *See Dawson v. Childs*, 665 F.2d 705, 710 (5th Cir.1982). The Fifth Circuit has found that Texas "has a vast arsenal to assure orderly adjudication of the serious constitutional questions presented" in some cases involving disputed property taxes. *Id.* (*quoting from and citing to City of Houston v. Standard Triumph Motor Co.*, 347 F.2d 194, 199 (5th Cir.1965) *cert. denied* 382 U.S. 974, 86 S.Ct. 539, 15 L.Ed.2d 466 (1966)). Since the system has been declared [state] unconstitutional partly because it is effectively an illegal state ad valorem tax, the taxpayers could arguably bring an action under Section 112 of the Texas Tax Code by asserting that the tax is an unlawful state tax. *See* Tex.Tax Code Ann. § 112 (Vernon's 1982). The Circuit Court stated the availability of the aggrieved taxpayers to bring a declaratory judgment action, to seek injunctive relief, or to pay the tax and seek a refund. *Id.* Notably, in *Dawson*, the Fifth Circuit stated that it had "no doubt that the Texas courts will hear and rule upon [the taxpayers] claim against the tax authorities." *Id.* In the present action, the remedy in the Texas courts is much more than just doubtful. Such a remedy is nonexistent.

Although the mere allegation of an inadequate State remedy will not suffice to

---

**18.** Specifically, Rule 13 of the Texas Rules of Civil Procedure states:

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purposes of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of contempt. If a pleading, motion or other paper is signed in violation of

this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanctions available under Rule 215–2b, upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. A general denial does not constitute a violation of this rule. The amount requested for damages does not constitute a violation of this rule. Tex.R.Civ.Proc. 13.

overcome the Tax Injunction Act, this action presents a model of the type of case that falls within the narrow exception to the Act. Although a state tax statute is properly subject to attack in state courts, a rule of law announced by the State's highest court that eliminates the possibility of a State remedy, consequently, eliminates the possible adequacy of the remedy under the Tax Injunction Act. To hold otherwise would be to allow the rule to swallow the exception, and such an interpretation of the Tax Injunction Act would necessarily violate the guarantees of due process under the Fifth and Fourteenth Amendments of the United States Constitution.

VIII. The Appropriate Injunctive and Declaratory Relief

■■■ In a case that involved similar issues concerning the consequences of the requested injunctive and declaratory relief, the Supreme Court addressed the problem of the appropriate scope of federal equitable remedies concerning the enforcement of a state statute before it had been declared [federal] unconstitutional. *See Lemon v. Kurtzman*, 411 U.S. 192, 199, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). The Supreme Court applied the nonretroactivity doctrine.[19] As the Supreme Court wisely explained, "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *See id.*, 411 U.S. at 200, 93 S.Ct. at 1469 (footnotes omitted). Federal district courts should be flexible in shaping remedies trying to reconcile public and private needs. *See id.* There is no federal constitutional violation based upon the conduct of state officials, local governmental entities and officials relating to the levy, collection, and assessment of these taxes imposed for the 1991 calendar year and due in January of 1992.

"[G]overnments must act if they are to fulfill their high responsibilities." *Id.*, 411 U.S. at 207, 93 S.Ct. at 1472. Indeed, as far as the relief requested for the taxes already paid under the county education district tax system, the Supreme Court's reasoning is directly applicable to such relief demanded by some of the plaintiffs:

> Appellants ask, in effect, that we hold those charged with executing state legislative directives to the peril of having their arrangements unraveled if they act before their has been an authoritative judicial determination that the governing legislation is constitutional. Appellants would have state officials stay their hands until newly enacted state programs are "ratified" by the federal courts, or risk draconian, retrospective decrees should the legislation fall. In our view, appellants' position could seriously undermine the initiative of state legislators and executive officials alike. Until judges say otherwise, state officers ... have the power to carry forward the directives of the state legislature.... We do not engage lightly in post hoc evaluation of such political judgment, founded as it is on "one . of the first principles of constitutional adjudication— the basic presumption of the constitutional validity of a duly enacted state of federal law." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, at 60, 93 S.Ct. 1278, at 1311 [36 L.Ed.2d 16] ... (1973) (Stewart, J., concurring).

*Id.*, 411 U.S. at 207–208, 93 S.Ct. at 1473. The Supreme Court also addressed the principles of federalism that should guide federal courts: "[F]ederalism requires that federal injunctions unrelated to state courts be shaped with concern and care for the responsibilities of the executive and

---

**19.** The Supreme Court stated that "the process of reconciling the constitutional interests reflected in a new rule of law with reliance interests founded upon the old" is one of the most difficult issues facing both state and federal courts. *Lemon v. Kurtzman*, 411 U.S. at 198, 93 S.Ct. at 1468. The effect of constitutional rulings are not subject to any principle of absolute retroactive invalidity but these rulings turn upon a consideration of many factors, such as the particular relations, particular conduct, particular rights, and of *public policy in light of the nature of the statute and its previous application. See id.*, 411 U.S. at 198–199, 93 S.Ct. at 1468. "[S]tatutory or judge made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct." *Id.*

legislative branches of state governments." *Id.*, 411 U.S. at 208, 93 S.Ct. at 1473.

Generally, "[S]tate officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful." *Id.*, 411 U.S. at 209, 93 S.Ct. at 1473.[20] On the other hand, state officials are not entitled to rely on a conclusively invalid and unlawful state statute.

The United States Supreme Court has explained the reach of decrees by the federal courts:

> The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not flow from such a violation, ..., or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation.... But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the " '*condition* that offends the Constitution.' "

*Milliken v. Bradley*, 433 U.S. 267, 281–282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977) (emphasis in original) (citations omitted). In the present action, the only conduct that violates the federal constitution is the continued collection of an unlawful tax where there is no adequate state remedy. No federal due process violation exists concerning the taxes imposed for the 1991 calendar year.

The exact method by which the State of Texas chooses to finance its schools does not raise a federal constitutional issue before this Court. This Court does not now and does not intend to ever become involved in the appropriate funding system

and educational structure for public education in the State of Texas. The Texas Legislature and the Texas Governor are the proper parties to address and resolve those concerns, with potential review by the Texas courts. Recently, the United States Supreme Court stated where the responsibility for education is and should properly be:

> ... [N]o matter has been more consistently placed upon the shoulders of local government than that of financing public schools. As we said in another context, "[t]he very complexity of the problems of financing and managing a ... public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that ... 'the legislature's efforts to tackle the problems' should be entitled to respect."

*Missouri v. Jenkins*, 495 U.S. 33, 52, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990) (citations omitted). This Court has no jurisdiction to address those issues, but this Court is confident that the State of Texas can and will achieve a constitutional system of funding public education.

The Fifth Circuit requires that the movant for a preliminary injunction has the burden of proving four elements:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) that the injunction will not disserve the public interest.

*Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir.1985). The United States Supreme Court has stated:

> In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.... Thus, the Court has noted that "[t]he award of an interlocutory

**20.** In the present case, there is some legitimate doubt as to whether this statute was enacted in good faith and whether it was plainly unlawful. Based upon the entire record, however, this

Court is unable to rule that the statute was either plainly unlawful or not enacted in good faith.

injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."

*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

Under the analysis of this opinion the plaintiffs have clearly met the first two factors. The plaintiffs have a legitimate federal constitutional right. According to the defendants' own argument, the likelihood of any postpayment remedy of these taxes is practically impossible. Because of this argument, there is a substantial threat of irreparable injury.

The third factor turns on the ability of the State to remedy this [state] unconstitutional system of school finance to avoid the collection of any future taxes under this system. The Texas Supreme Court justified the future prospective effect of its decision because a retroactive application of its decision "would be so damaging to the school system it could not further any purpose of the [Texas] Constitution." *Edgewood III*, at 520–21. Because of the future prospective effect of its decision, the Texas Supreme Court recognized that it was permitting and condoning a collection and levy of an ad valorem tax that violates two provisions of the Texas Constitution. *Id.* The Texas Supreme Court also was very aware of its restriction imposed on the possible relief taxpayers could obtain in light of its decision: "We only limit that relief because it is impossible to give full retroactive effect to our decision without destroying the constitutionally [referring to the Texas Constitution] guaranteed interests that it serves."

Although strongly inclined to not alter the effect of a ruling of the highest court of the State of Texas, this Court must also recognize the rights guaranteed under the Constitution of the United States. Although the right to an efficient and fair education is recognized under the Constitution of the State of Texas, the United States Supreme Court has held that education is not one of the rights protected explicitly or implicitly under the United States Constitution. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 1297–1298, 36 L.Ed.2d 16 (1973). To the contrary, the right of due process is a right that is explicitly protected under the United States Constitution. For the same reasons that the lower courts and administrative review boards of Texas must respect and follow the State constitution and the decisions of the highest State court, so to must this Court respect and follow the decisions of the United States Supreme Court.

Although education has not been recognized as such a right, the right to due process of the law whenever a State deprives a person of property is a right guaranteed under the United States Constitution. *See* U.S. Const. Amend. 5 and Amend. 14. Because this right to due process is a fundamental federal constitutional right, not only must this Court recognize the existence of such a right but this Court must also prevent the violation of this right.

The Texas Supreme Court itself stated:

While the Legislature has some latitude in the manner it chooses to discharge its duty to establish and maintain an efficient public school system, it cannot go so far as to violate another constitutional provision in attempting to comply with article VII, section 1 [of the Texas Constitution].

*Edgewood III*, at 502. Because of the future prospective effect of its decision, the Texas Supreme Court has permitted the Legislature to do exactly what that court stated the Legislature could not do.[21]

---

**21.** Although the Texas Supreme Court stated that it would limit the effect of its holding for

Some other inconsistencies are self-evident in the reasoning of the Texas Supreme Court's explanation of its decision to stay the effect of its ruling until July 1, 1993. If the Legislature does not reach a decision by that date, the Texas Supreme Court does not explain what will occur. Also, if the Texas Supreme Court feels that the Legislature can create a constitutional plan for taxes due for the 1993 year before the July 1, 1993 deadline, does it not make sense to assume that the Legislature could create a constitutional plan for taxes due for the 1992 year by July 1 of this year. The Texas Supreme Court, itself, expressly recognized that the legislative and executive branches of government of the State of Texas could adopt a constitutional school finance plan immediately:

The Governor may well consider the best interests of the people require that the Legislature be called immediately into session to adopt a constitutional school finance plan *for the coming school year.* Legislatures, too, may believe that the best interests of their constituents mandate immediate action.

*Edgewood III,* at 522–23. Further showing of the ability of the Legislature to enact a school finance system within a very short period of time, the Texas Supreme Court explained that the Legislature had enacted the current school finance system in under three months, as amended in approximately four months, from the date of its *Edgewood II* opinion, not the mandate of *Edgewood II. See Edgewood III,* at 521. The Texas court seems to stress the Legislature's then being in regular session as a reason for the rapid action. More significant, however, is the Governor's guaranteed ability to limit the agenda of the special session as she desires:

When the Legislature shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session, or presented to them by the Governor; and no such session shall be of longer duration than thirty days.

*See* Tex. Const. Art. 3 § 40. Although logic does not always apply to the political process, the ability of the Legislature to convene and resolve one specific and limited issue would seem to be easier in a special session than to try to to resolve the same issue in regular session where countless numbers of issues are presented to the Legislature for consideration. The Legislature need only determine the rates and methods by which to apply a tax because the various mechanisms for implementing a tax are already in place. The properties subject to this tax will·have already been appraised for the year. Although clearly outside the province of this court to compel the legislative or executive branches of a State to act in such a situation, the Texas Legislature and the Texas Governor can clearly adopt a constitutional school finance plan for the approaching school year.

Once a state taxation scheme has been declared invalid under the state constitution, the taxpayers of that state must be given a substantive means to protest any payments of taxes incurred under such a scheme. A merely *pro forma* state remedy does not satisfy the demands of due process under the United States Constitution.

However, the third and fourth factors to be considered in determining whether an injunction should issue weigh against the issuance of an injunction. The fourth factor requires a determination that the injunction will not disserve the public interest. This tax scheme affects millions of people and entities who own property in Texas. The scheme also affects over one thousand local school districts. Most importantly,·this tax scheme and its generated funds has a direct effect on approximately some 3.4 million children of the State of Texas. Because an injunction of the future collection of these taxes could

over 17 months, that court did not state that it could not extend such a time limit. Additionally, whether such a limitation had been for 17 months or indefinitely makes no major difference in the effect of that court's decision. Pre-

sumably, that court's declaration that the [state] unconstitutionality cannot be used as a defense to the payment of these taxes could last much longer than 17 months because taxpayers could refuse to pay these taxes for a longer period.

have a disastrous effect on these children, an injunction is not properly issued at this time.

The education of our children is one of the most important functions of government. Education of our children should displace partisan politics. Our children are our future. Their education will determine our future. In the interests of our children and our future, the Governor of the State of Texas and the Texas Legislature should work together to find a constitutional solution, of which there are many alternatives.